[Cite as *State v. Williams*, 2021-Ohio-3006.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                   :

     Plaintiff-Appellee,                  :

                                        No. 19AP-824

v.                                              :     (C.P.C. No. 18CR-4210)

Kyle J. Williams,                               :     (REGULAR CALENDAR)

     Defendant-Appellant.               :

---

D E C I S I O N

Rendered on August 31, 2021

---

**On brief:** [*G. Gary Tyack*], Prosecuting Attorney, and *Michael P. Walton*, for appellee. **Argued:** *Michael P. Walton.*

**On brief:** *Stephen E. Palmer* and *Jeffery A. Linn, II*, for appellant. **Argued:** *Stephen E. Palmer.*

---

APPEAL from the Franklin County Court of Common Pleas

NELSON, J.

{¶ 1}   A jury convicted Kyle J. Williams of having raped A.P.  He appeals.  We find no reversible error, and affirm the convictions.

{¶ 2}   At the heart of the trial were the dueling accounts of prosecuting witness A.P. and defendant Williams.  *See, e.g.,* Appellant's Brief at 1-2 ("A.P. testified that [Mr. Williams] raped her.  [Mr. Williams] testified that the interaction was consensual.  The case turned almost exclusively on their respective credibility.").  Jurors heard both accounts.  A.P. was subject to vigorous cross-examination, and jurors were entitled to believe the essence of her version.  They were not required to believe Mr. Williams.

{¶ 3}   At the time of trial, A.P. was a 33-year-old single mother and breast cancer survivor who worked as a make-up artist. Tr. Vol. II at 34-35.  Although she had been one

year ahead of Mr. Williams at the same high school, they had run in different circles and had not known each other well during their student years. *Id.* at 36-37. They re-encountered each other accidentally at a bar in October of 2017, *id.* at 37; Mr. Williams was insistent that they "had hooked up in high school," and A.P. told him he was mistaken, *id.* at 40, *see also* Tr. Vol. III at 15 (Williams testifies that "[s]he looked similar to someone that I thought she was" from 19 years earlier). After they went their separate ways from the bar, A.P. began a Facebook correspondence with Mr. Williams, Tr. Vol. II at 41; she had thought him "very good-looking," and "it seemed like he was a really nice guy," *id.* at 45.

{¶ 4} They did not meet again in person until March 16, 2018, the day before St. Patrick's Day and during college basketball tournament season. Efforts to meet at a bar the day before had fallen through; after Mr. Williams messaged that he was not in the habit of making plans, A.P. responded, "let's plan on some March Madness tomorrow." *Id.* at 52. They met at an establishment called Classics that Mr. Williams identified as less of a madhouse at the time than Yogi's, another bar they discussed (and where A.P. testified that she was planning eventually to meet her friend Michelle and Michelle's mother). *Id.* at 54, 57. As he was arriving, Mr. Williams texted, "[p]ulling in," to which A.P. responded with *The Office* line, "[t]hat's what she said." *Id.* at 55. As recounted by A.P., she and Mr. Williams had "about two drinks" and "talked about [A.P.'s] journey through cancer and just life." *Id.* at 56. They played pool, and A.P. accepted Mr. Williams's bet that the loser would give the winner a back massage. A.P. lost. *Id.*

{¶ 5} A.P. told the jury that in due course, at about 5:00 in the afternoon, she asked Mr. Williams if he wanted to go with her to meet Michelle and Michelle's mother, and that he suggested that they drive (separately) to his house for a drink and then take an Uber from there. *Id.* at 57-58. She accepted that invitation. *Id.* Once at Mr. Williams's house, she chatted with his housemate and tenant (identified by his later testimony as Kevin Crook) and his young daughter, who were watching television on the first floor. Mr. Williams then suggested to A.P. that they go downstairs for a drink. *Id.* at 60. A.P. averred that upon going down to the basement, she "immediately felt uncomfortable when [she] saw just a mattress lying on the ground." *Id.* at 60. She did not like the "dark and dirty atmosphere," with "water bottles and half[-]empty liquor

bottles" strewn on the floor: she testified as to her impression that "it was odd for somebody who was driving a Jag to just have a mattress in a basement." *Id.* at 61. Mr. Williams explained that he worked in Cincinnati "but owned this condo and rented it out" to others who let him stay there as needed. *Id.* at 62.

{¶ 6} A.P. testified that she sent a text message to her friend Michelle, asking that Michelle call her so that A.P. would have an excuse to leave. *Id.* at 66. On cross-examination, A.P. acknowledged that she had not previously divulged that text, *id.* at 85, 105-06; she offered to show it to defense counsel on her cell phone, an offer he declined, *id.* at 148.

{¶ 7} She did fulfill what she saw as the terms of her bargain by giving Mr. Williams a back massage, she said, although "I was not giving it my best effort." *Id.* at 67. Cross-examined about her report to the police, she said that she had told them that he had taken his shirt off and pulled her onto the bed, saying that he was ready for the massage that she then provided. *Id.* at 119 (adding at 120 "it was just a back massage, and then I planned to leave"). In a later account to police, she said that she had demurred on giving the back rub, wanting more to drink so that she "would be more into it," but that after he pulled her onto the bed, she gave him "a half-assed back massage." *Id.* at 132.

{¶ 8} A.P. testified that she concluded the massage by standing up and asking Mr. Williams who should summon the Uber; she also asked him for a drink, she recounted, and after he said he didn't have anything for her to drink and she said she was getting the Uber, he pushed her back onto the bed with both hands. *Id.* at 68. He unbuttoned his pants, and hers, "[a]nd I kept saying: No, I don't want to do this. And I went to sit up to get him off of me, and then he pushed me back down and grabbed my throat, squeezed, and stuck his finger inside of my vagina." *Id.* at 68-69.

{¶ 9} She reiterated that she had said 'no' and that "after I kept protesting, that's when he put his hands on my throat and started squeezing and choking me." *Id.* at 69. "And I kept saying no, and he wasn't listening." *Id.* at 69-70. A.P. repeated her testimony of digital penetration, and then described painful vaginal penetration. *Id.* at 70. She said that she asked for lubricant "as like a tactic to get him off of me * * * * [a]nd he said he didn't have any." *Id.* at 72. She then described eventual anal penetration, and further rough vaginal intercourse. *Id.* at 72-73.

{¶ 10} When the physical encounter ended, she testified, she put her underwear and pants back on, "ran out" of the basement, and went back upstairs to where "the TV was blaring." *Id.* at 73. The male she had met earlier as Mr. Williams's roommate was there with another adult: "He asked me if Kyle was asleep. I said I don't know, and I left." *Id.* at 73-74.

{¶ 11} A.P. testified that she then drove to Yogi's bar in search of Michelle. *Id.* at 74-75. Michelle was not there, and she drove home. *Id.* at 75. At 6:04 p.m., right after she had left Mr. Williams's condo, he had messaged her: "You bounced like that." *Id.* at 77 and Ex. B. She responded from her home at 8:35 p.m.: "Yeah i did[.] I felt forced to have sex. I'm not going to #metoo or that bullshit. But you need to know - choking a woman shows dominance and [I] said no more than twice...tonight was not a pleasurable act. It was forced and uncomfortable. I'm letting you know this for the future...don't do that shit to other women. *i said no[.]" *Id.* at 77 and Ex. B. He replied: "Where you[?]" *Id.* at 78 and Ex. B.

{¶ 12} The next day, A.P. testified, she talked with Michelle and worked a long day at a wedding. *Id.* at 76, 79. On March 18, 2018, the day after that, she spoke with a lawyer friend and then reported the incident to police and underwent a physical examination at the hospital. *Id.* at 80.

{¶ 13} Under cross-examination, A.P. agreed that she had found Mr. Williams attractive and had engaged in their Facebook communications with an eye toward perhaps dating him. *Id.* at 98-99. She agreed that she had not called the police immediately after the incident. *Id.* at 111. She agreed that after she had left Mr. Williams's condo, she encountered her ex-husband at Yogi's (and said that she spoke with him briefly, not mentioning rape or that she was terrified). *Id.* at 112-13. She also said that she lived with her parents, who were at home when she returned on the evening in question, and that she had not shared the events with them. *Id.* at 114-15; *see also id.* at 117-18 ("I did not call the police right away. I was confused. I thought it was my fault. I had a whole day of work. I was so overwhelmed, and I didn't know what to do."). She agreed that she had had a couple drinks, gone down into Mr. Williams's basement, and given him a back massage. *Id.* at 120-21. She also held to her account that she had been "forc[ed] * * * to have sex after I said no." *Id.* at 116.

{¶ 14} Cross-examination explored matters including the prelude to A.P.'s visit to Mr. Williams's condo, *see, e.g., id.* at 99 (Q. "[Y]ou didn't know where the relationship was going to go, but it was going to go somewhere, right?" A. "Right."), 99-106 (tenor of electronic communications); her voluntary decisions to go into Mr. Williams's basement and to give him a back massage there, *see, e.g., id.* at 121 (Q. "in your world, what message does that send to a man when you go down into his basement after you've been at a bar * * *?"); the time lag between the events of March 16 and her March 18 report to police, *see, e.g., id.* at 111-15; and certain suggested conflicts between her testimony and statements to others, *see, e.g., id.* at 122-23 (whether Mr. Williams took his pants off while on top of her, as stated in police interview, or while standing next to her, as she testified); 127 (whether the lawyer friend she consulted persuaded her to report the incident as opposed to advising her how to do so); 126, 145-46 (did not report digital penetration during first recorded police interview; examining nurse's report does not provide account of digital penetration).

{¶ 15} A.P. did not retreat from her fundamental stance that when Mr. Williams "was on top of me, raping me after I said no, he knew" (in effect that she was not a willing participant). *Id.* at 120; *see also, e.g., id.* at 156-58 (re-direct: flirtatious electronic communications, visit to basement, etc., are not tantamount to consent to sex).

{¶ 16} Mr. Williams testified to his own perspective. "I definitely knew that she was into me," he averred on direct examination. Tr. Vol. III at 17. "I mean, a girl who usually pursues me like multiple times, wants to hang out all the time, pretty much wants more than just a friend." *Id.* at 17-18 (adding when asked "do you mean like some kind of romantic involvement, or something else?": "Yeah, like something more intimate."). But while he saw A.P. as wanting "intimate" companionship, he testified to different initial motives of his own: "I was really just kind of like more of a business relationship with her. So when we kind of like established that we were going to meet up, I asked Kevin [Crook] to come with me for that reason, because I didn't want her to think it was a date kind of situation. * * * * And I was actually trying to hook Kevin and her up." *Id.* at 19. (Although Mr. Crook's earlier testimony had been that Mr. Williams had sounded him out before about a potential business relationship, Tr. Vol. II at 163, and had on that March 16th day asked him to go along to the bar for a business meeting, *id.* at 165, he did not testify to any

knowledge that Mr. Williams meant to set him up with A.P. *Compare* Tr. Vol. III at 37 (Williams on cross: Q. "You said you were hoping to hook her up with Kevin. Did you tell Kevin about that?" A. "It might have come up. * * * * "). Mr. Williams elaborated on cross-examination: "I wasn't solely looking to introduce business. I was looking to get to know her to see if she was even a good fit, or maybe even just meeting a friend or having a friend. I'm just saying I wasn't looking forward to -- looking for a romantic relationship with her. That wasn't why I was talking with her." *Id.* at 39.

{¶ 17} Mr. Williams's account of some of the background overlapped with A.P.'s. He confirmed, for example, that when he and A.P. had encountered each other in October of 2017, he had said, "I think you and I hooked up back in high school." *Id.* at 15. (At that chance meeting in October, he testified, A.P. had asked him to buy her a drink because her ex-husband was with her and she wanted to make him jealous. *Id.* at 16 ("I said, I'm not a part of that drama stuff, but I'll add you on Facebook.")). He acknowledged that nothing about their preliminary conversations had indicated that the two were going to have sex. *Id.* at 40 (on cross: "No. But I mean, I did understand that she did kind of like me like that."). He agreed that when he and A.P. then met on March 16, 2018, he proposed the pool game bet of a back massage. *Id.* at 19-20 (adding when asked on direct examination, "from your perspective, had this changed from a prospective business meeting to something else?", "Kind of for her probably. I mean, I knew she was going to give me a back massage on a game that she's horrible at. I think it was pretty obvious that she was, you know, attracted to me"); *see also id.* at 20 (Q. "And were you attracted to her?" A. "Yeah, a little bit."); 43 (on cross: "It wasn't my first time I've used that bet."). And he, too, said that he and A.P. had planned to have a drink at his house before going on to another bar (although he testified that Uber was not discussed and that he had envisioned Mr. Crook driving them). *Id.* at 46-48.

{¶ 18} Mr. Williams's account diverged more dramatically from A.P.'s, however, when he described his version of what went on in his basement. He had not told A.P. before they went downstairs that he used the basement as a bedroom, he acknowledged, *id.* at 51 (on cross), but when he asked, "How about that massage," took his shirt off, lay on the bed, and received his backrub, A.P. appeared comfortable with the situation, he testified. *Id.* at 24-26 (direct: A. "Yeah. Why wouldn't she be?"). After he could feel her

tiring from the massage, he told the jury, he "just kind of rolled over," as did she, and they "started making out." *Id.* at 26. From there, he said, "I unbuttoned her pants. I put my hands down her pants and started playing with her vagina" and taking his pants off. *Id.* at 26. "And then I went to take her pants off, and then that's when she said, Hold on a second. Let's drink some more first." *Id.* at 27. "I just said, I don't have any alcohol. We can go get some afterwards, but we're already here. Why don't you just let me put the tip in, and if it doesn't feel good, I'll just take it out and stop." *Id.* A.P.'s response, he said, was to laugh. *Id.* "And then I attempted [to pull her pants down] for the second time, and then that time, she actually helped me." *Id.* at 28. Mr. Williams also told the jury that after A.P. had requested lubricant and been told that he didn't have any, she asked, "how do you want to finish?" *Id.* at 28. In response to his lawyer's question, "How did she appear to you after the sex was over," Mr. Williams answered: "She acted satisfied." *Id.* at 29.

{¶ 19} A.P. then suggested that he go with her to meet her friends at Yogi's bar, Mr. Williams averred, but he said he would wait for Mr. Crook to be free. *Id.* He testified that she then asked to use the bathroom, but when he went upstairs a few minutes later, she was gone. *Id.* at 30 ("I'm like, Seriously?"). Mr. Williams told the jury his sensibilities were offended: "I felt like I was used." *Id.*; *compare id.* at 45 (on cross: "I was open to whatever, even if it was a one-night stand"), 72 (recorded statement of Mr. Williams to police: "This was a one-night stand. It was like nothing more than that.").

{¶ 20} Under cross-examination, Mr. Williams disputed the testimony of his tenant Mr. Crook that Mr. Williams had said of sex with A.P. that he had "smashed it." *Compare* Tr. Vol. II at 170 (Crook) with Tr. Vol. III at 59 (Williams). He did acknowledge that after he received the message from A.P. stating that she had felt "forced to have sex[,]" and had "said no more than twice[,]" and enjoining him "[d]on't do that shit to other women* * * * [I] said no[,]" he laughed with his friends about it. Ex. B. and Tr. Vol. III at 60 (also saying, "[t]his girl was just on top of me, asked me to go meet her friends, and look at the text she just sent me. Like psycho."); *see also id.* at 61 ("At that time, it was funny.").

{¶ 21} During cross-examination of Mr. Williams, the jury also heard some of his recorded police interview. At Classics, he said, "I could tell that she was already into it."

*Id.* at 68. After they went to his house and basement: "She's giving me a massage. And then when I roll over to seduce, she did say, No, but she said, Let's get one more drink first." *Id.* at 69 (then proceeding at 69-70 with account much along the lines of his testimony, if perhaps more detailed, and arguing, "Why would I rape a girl with an eight-year-old [child] right upstairs?"). When the Detective asked, "[s]o it was basically consensual?" Mr. Williams replied: "Yeah, I would say it was consensual." *Id.* at 70.

{¶ 22} When the cross-examination concluded, defense counsel elected not to ask Mr. Williams any further questions. *Id.* at 76.

{¶ 23} Although A.P. and Mr. Williams were the central witnesses, others did testify. The prosecution began its case by calling the patrol officer who on March 18, 2018 had been dispatched to the hospital after A.P. arrived there and reported an alleged sex crime. Tr. Vol. II at 25-26. He was in the hospital room with A.P. for 10 to 12 minutes, gathering information; asked about A.P.'s "demeanor," he used the words "polite," "upset," and "forthright." *Id.* at 26-27. His brief testimony did not detail the substance of the allegations. *Id.* at 23-33.

{¶ 24} After A.P. testified, the state called Kevin Crook. A retired Air Force and Air National Guard officer who rented a room in Mr. Williams's condo, he said that he had earlier had to decline Mr. Williams's invitation to accompany him to a bar "to speak about his business." *Id.* at 163-65. He was watching television on the first floor with his then seven-year-old daughter and another tenant when Mr. Williams arrived with a woman (now known to have been A.P.). *Id.* at 163-64. "It definitely seemed like they had been drinking[.]" *Id.* at 166.

{¶ 25} Mr. Crook told the jury that after chatting, Mr. Williams and the woman adjourned to the basement: "Approximately 20 minutes later, the female exited the condo." *Id.* at 168. As she was leaving, he told her it was nice to have met her; "[s]he turned around, smiled and said the same to me and then left. About 5 minutes later, Kyle came up * * * asking where she was. I don't think he was aware that she had left." *Id.* Mr. Williams told him that Mr. Williams and A.P. "had sex." *Id.* at 170 (Mr. Crook's words). During the ensuing "guy talk," Mr. Williams "got into a few of the details." *Id.* "He mentioned that he 'smashed it'[,] was the terminology * * * * He mentioned that they had sex and that she was aggressive. And that something about her -- she came on to him

very strongly. * * * * Basically, like she attacked him once they got in the basement, like she jumped on him." *Id.*

{¶ 26} Mr. Crook had heard no sounds of struggle or "any sounds whatsoever" coming from the basement. *Id.* at 172. The television had remained on, *id.* at 169, but Mr. Crook testified on cross-examination that he believes he would have heard any commotion; the stairway to the basement is not shut off by any door, and is a "completely open passageway," *id.* at 180; *see also id.* at 181-82.

{¶ 27} A.P.'s friend Michelle testified next. A hairdresser, she works with A.P. in connection with bridal events; A.P. does most of the communication with the brides because she is "straightforward, but calm and collect[ed]." *Id.* at 187. A.P. had invited Michelle, along with Michelle's now-husband and her mother, to meet A.P. and Mr. Williams at Classics "just to kind of be buffers," Michelle related. *Id.* at 188. A.P. subsequently communicated that "[s]he had left Classics and told us that she would meet us over at Yogi's, so we went over there" that afternoon. *Id.* at 189.

{¶ 28} Michelle then testified, without immediate objection, that in the evening, her husband received a text to both of them in which A.P. wrote "that she had just been sexually assaulted." *Id.* at 190. After Michelle described when and how that text was received, the prosecutor asked her: "was there more communication that evening between either you and her or your husband and her?" When Michelle began to answer— "There was. He said --," the trial court sustained a defense objection. *Id.* at 191. The trial court then instructed: "You have to stick to what you observed personally. If you got a text, that's fine, but if you weren't on the text, you can't tell us what the text said, and you can't tell us what your husband told you at the bar about what he was getting." *Id.* Michelle then stated that, "I did text [her] after I had heard what had happened[,]" later saying, "I did just ask if she was okay and if she needed us and what was going on. There were texts back and forth. And all she told me was --." *Id.* The prosecutor then interrupted the witness to note: "You can't speak about what she had said." *Id.* at 192. Michelle reiterated that she had asked about A.P.'s well-being.

{¶ 29} Michelle testified without objection that when she spoke by telephone with A.P. the next day, A.P.'s demeanor was that she was "[s]hocked." *Id.* at 192. Michelle subsequently met A.P. for lunch and heard her account. *Id.* at 192-93. When the

prosecutor inquired as to A.P.'s demeanor at that lunch, defense counsel renewed an oral "motion-in-limine objection" that such testimony would be excludable hearsay. *Id.* at 193; *see also id.* at 5-8. The trial court overruled the objection, and Michelle testified that "initially it was very like to the point. She was very like: This is what happened. And as the story went on and the details kind of got a little more in depth, she did start crying a lot, which I had never seen her cry before. I would say she was pretty distraught." *Id.* at 193. Michelle's testimony ended without specifics as to what A.P. said, and the defense declined cross-examination. *Id.* at 195.

{¶ 30} The final witness who testified before Mr. Williams took the stand in his own defense was Ohio Health systems coordinator and forensic nurse overseer Anne Eyre-Stevens. Before she testified, the parties stipulated that a sperm fraction in the vaginal samples nurse Stevens collected from A.P. on March 18, 2018 bore Mr. Williams's DNA, as did A.P.'s oral swab. *Id.* at 199.

{¶ 31} Nurse Stevens, who herself has administered "[o]ver 200" sexual assault examinations and who oversees 40 to 50 sexual assault nurse examiners or trauma-informed nurses at any particular time, spoke of the "very invasive" exam she administered to A.P. on March 18, 2018. *Id.* at 206. Nurse Stevens has been qualified as an expert witness in other litigation, and averred that her primary job responsibilities involve treating sexual assault or trauma-informed patients. *Id.* at 207. She was accepted as an expert witness by the trial court here without objection, and the judge advised the jury that although she could offer medical opinions based on her training and experience, her credibility would be for the jury to determine. *Id.* at 208. Her medical records as based on her interview and examination of A.P. were provided to the jury without objection. *Id.* at 216-18.

{¶ 32} As she testified, those records reflect that A.P. reported to her that "the perpetrator * * * put [his] penis * * * in her vagina and rectum" and that there had been no digital penetration. *Id.* at 220. A.P. also reported that "[h]e used his hands and he was choking me." *Id.* Nurse Stevens documented redness in A.P.'s neck, and bruising of her upper and lower extremities. *Id.* at 222. She applied a "toluidine blue" solution as a stain to "better see injury in the vaginal area," and identified injuries there. *Id.* at 223. And she walked the jury through photographs of the affected areas. *See, e.g., id.* at 232 (Exhibit

D3 shows "redness * * * under the chin and the left side of the neck"), 233 (D6 shows "a small area of an abrasion underneath the ear"), 234 (D7 reflects redness and abrasion under the chin; D9 shows a "small abrasion * * * to the left wrist"; D13 reveals "dark bruising to the left inner arm"), 235 (D17 shows "one-and-a-half-centimeter abrasion to the left knee").

{¶ 33} Nurse Stevens also testified without recorded objection that she does not frequently see vaginal injuries in sexual assault victims; that is due, she said, to the nature of the tissue and to natural lubrication, and "[t]here's also the fight, flight, or freeze" response that can reduce the possibility of such injuries. *Id.* at 239-40. She also said that in her experience, patients who have been sexually assaulted "typically" do not report the crime the day it occurs. *Id.* at 243; *see also id.* at 244 ("I would say the majority of our patients probably come in around the three-day mark or so, two or three days after the assault"); 247 (on cross: does not keep written statistical analysis of reporting lags); 248 (on cross: repeats "it's usually * * * that two-to three-day mark").

{¶ 34} Nurse Stevens was the state's last witness. Following Mr. Williams's testimony, closing arguments, and instructions, the jury deliberated that afternoon and the next morning for a total of just under four hours; it then returned verdicts of guilty on each of the three rape charges. Tr. Vol. III at 154-61. By entry of November 12, 2019, the trial court denied Mr. Williams's October 3, 2019 motion for a new trial. The trial court sentenced Mr. Williams to prison for nine years on each count, with those sentences running concurrently for a total of nine years imprisonment. November 25, 2019 Judgment Entry. It also imposed a fine of $10,000, ordered restitution of $9,360 (for counseling services), and classified Mr. Williams as a Tier III sex offender. November 25, 2019 Judgment Entry; November 21, 2019 Sentencing Hearing Tr. at 29-30.

{¶ 35} Mr. Williams presents us with eight assignments of error:

> [1.] The state committed prosecutorial misconduct throughout trial by admitting and arguing character, sympathy, and opinion evidence designed to appeal to the passions and prejudices of the jury, thereby depriving appellant of due process and a fair trial as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

[2.] The trial court erred and thereby deprived appellant of due process of law as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution by overruling appellant's Crim. R. 29 motion for judgment of acquittal, as there was insufficient evidence to support a conviction.

[3.] Appellant's convictions were against the manifest weight of the evidence and thereby violated due process of law as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

[4.] The trial court erred by admitting improper hearsay evidence in violation of the Rules of Evidence and appellant's rights of confrontation and to due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

[5.] The trial court committed plain error by permitting testimony from a state expert in violation of Ohio Criminal Rule 16(K), thereby depriving appellant of due process of law as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

[6.] The trial court erred by admitting improper testimony vouching for the veracity and credibility of the alleged victim in violation of the Rules of Evidence and Appellant's right to due process of law as guaranteed by the Fifth, Sixth, and Fourteenth Amendment[s] to the United States Constitution and comparable provisions of the Ohio Constitution.

[7.] The appellant was denied the effective assistance of counsel contrary to his rights guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution and Article I, Section 10 of the Ohio Constitution.

[8.] Under the doctrine of accumulated error, the error committed by the court, the misconduct committed by the state, and the ineffective assistance of appellant's trial counsel warrant reversal.

Appellant's Brief at vi-viii (capitalizations adjusted).

{¶ 36} Having already summarized the trial testimony, we turn first to Mr. Williams's second and third assignments of error (regarding the sufficiency and weight of the evidence). For the purposes of analyzing these two assignments, we will not count against Mr. Williams any of the specific evidence that any of his other assignments argue was improperly admitted (even though we will overrule those other assignments as well).

{¶ 37} On each of the three rape charges, the jury found that Mr. Williams had engaged in sexual conduct of the specified type with A.P. when he "purposely compelled her to submit by force or threat of force." *See* Tr. Vol. III at 143-46 (jury instructions; Mr. Williams does not quarrel with the definitions given for any of the relevant terms). A.P.'s testimony alone provided a legally sufficient basis for the convictions: the trial court appropriately denied Mr. Williams's Rule 29 motions for acquittal. *See, e.g. State v. Najar*, 8th Dist. No. 106802, 2018-Ohio-5348, ¶ 35 ("The victim's testimony, if believed, is sufficient to establish that appellant committed the rape").

{¶ 38} "In reviewing a challenge to the sufficiency of the evidence, an appellate court must determine 'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Neil*, 10th Dist. No. 14AP-981, 2016-Ohio-4762, ¶ 94, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "Where the evidence, 'if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt,' it is sufficient to sustain a conviction." *Id.; see also, e.g., State v. Daniels*, 10th Dist. No. 18AP-626, 2019-Ohio-1791, ¶ 9 (citations omitted).

{¶ 39} On this score, Mr. Williams argues first that the state failed to adduce sufficient evidence to permit the jury to find that the sexual conduct had been compelled through "force or threat of force." Appellant's Brief at 17-19. The trial court had defined "force" to mean "any violence, compulsion, or constraint physically exerted by any means," and had defined "threat" to mean "a statement or conduct, whether direct or indirect, exerting pressure sufficient to overcome the will of another, or making another person fearful or apprehensive of injury or harm." Tr. Vol. III at 144-45. And Mr. Williams acknowledges that "[a] victim 'need not prove physical resistance to the offender

in order to demonstrate force,' " and that force or threat of force " 'can be inferred from the circumstances surrounding sexual conduct.' "  Appellant's Brief at 18-19 (citations omitted).  But here, he argues that "any alleged acts of 'force' were part and parcel with the sexual acts."  *Id.* at 19 (conceding, with emphasis in original, that "A.P. *felt* that she was forced").

{¶ 40} A.P. testified that Mr. Williams pushed her onto the bed with both hands, ignored her entreaties to stop, and physically restrained her.  Tr. Vol. II at 68-69.  "[A]fter I kept protesting, that's when he put his hands on my throat and started squeezing and choking me."  *Id.* at 69.  The jury was not required to discount that testimony as being simply "part and parcel with the sexual acts."  Her testimony provided sufficient evidence from which the jury could conclude that Mr. Williams compelled the sexual conduct through force or threat of force.  *Compare* Appellant's Brief at 23 (conceding that "A.P.'s version * * * allege[s] forceable rape").  And although A.P.'s testimony would itself pass sufficiency muster, the jury also would have been entitled to conclude, for example, that the photographs taken at the hospital within two days of the episode buttressed her account.  *See, e.g.,* Exs. D-5, D-6 (neck), D-9, D-12 (wrist).

{¶ 41} Mr. Williams then argues that because A.P. testified that Mr. Williams had "tried to insert his penis into my butt," but "that didn't work" and was "unsuccessful," her later response that "[j]ust the tip" entered her there did not provide sufficient evidence of penetration for that Count 2.  Appellant's Brief at 19-20.  Mr. Williams submits that "[i]t was clear * * * that A.P. initially denied penetration.  Any evidence to the contrary was insufficient considering the entire exchange of questioning on this topic."  *Id.* at 20.  But this is an argument of weight, not sufficiency.  And the jury was entitled to believe any part of A.P.'s testimony.  We overrule Mr. Williams's second assignment of error.

{¶ 42} Mr. Williams fares no better with his argument that his convictions were against the manifest weight of the evidence.  Here, we review the entire trial record, weigh the evidence and all reasonable inferences, and consider the credibility of the witnesses; we determine " 'whether in resolving conflicts in the evidence, the [jury] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' "  *State v. Thompkins*, 78 Ohio St.3d 380, 397 (1997) (citation omitted).  "In conducting our review of the evidence, 'we are guided by the

presumption that the jury * * * is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Neil*, 2016-Ohio-4762, at ¶ 102 (citations omitted). Reversal on manifest weight grounds is warranted only in the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Id.* This is not such a case.

{¶ 43} Mr. Williams begins his argument here by noting that the electronic communications between him and A.P. in the months leading up to their March 16, 2018 encounter were "flirtatious and even included sexual inuendo," and that on that day: "A.P. voluntarily met with Appellant, consumed alcohol with him, and agreed to wager a back massage over a game of pool. She accepted his invitation to go to his condo and voluntarily accompanied him to [the] * * * basement * * *. When Appellant removed his shirt, A.P. voluntarily performed the agreed upon back massage." Appellant's Brief at 22. This prelude, he submits, "cast[s] doubt over the events in question" and "negates the proof" of the 'purposeful' element of the rapes and the use of force. *Id.* at 22-23, 29. Mr. Williams's brief acknowledges that this "background" is not "a substitute for 'consent,' " *id.* at 22, and on that point, at least, he is correct.

{¶ 44} And Mr. Williams concedes, too, that "A.P.'s version" of events (an account that included her repeated protestations and his pushing, squeezing, and choking) was "alleging forceable rape." *Id.* at 23. Having reviewed the entire record, we find no reason to conclude that the jury was required to accept the gist of his account over hers.

{¶ 45} Mr. Williams's contention that the jury so lost its way as to require us to nullify its results hinges on his view that the jury should have believed him and not her. *See* Appellant's Brief at 21 ("case was premised almost exclusively on the credibility of A.P. and Appellant," and there was "ample reason to doubt her"). But the jury saw both testify, observed their demeanors, heard their inflections, and reviewed the exhibits, in addition to hearing from the other witnesses, and the paper record does not justify discounting their verdict.

{¶ 46} In urging that his behavior "may have been reckless" and "may even have been offensive[,]" but was not purposeful compulsion by force or threat of force, *see* Appellant's Brief at 28-29, Mr. Williams points to A.P.'s request for lubricant (which she

referenced as "a tactic to get him off of me," Tr. Vol. II at 72) and the fact that both testified to the event having involved "multiple [sexual] positions," Appellant's Brief at 23. But these consistencies support her account as much as his. He urges as another point of agreement that "A.P. did not scream or fight him off," Appellant's Brief at 23, but she did testify: "I kept saying: No, I don't want to do this. And I went to sit up to get him off of me, and then he pushed me back down and grabbed my throat, squeezed, and" inserted his finger into her. *Id.* at 68-69 (adding "after I kept protesting, that's when he put his hands on my throat and started squeezing and choking me"). "I was terrified," she said, "and all I could think about was my daughter and staying alive so I could get home to her alive." *Id.* at 69. In any event, "[a] victim need not prove physical resistance to the offender in prosecutions" for rape. R.C. 2907.02(C).

{¶ 47} Mr. Williams argues further that A.P.'s accounts to various authorities were so inconsistent as to merit reversal of the verdicts. A.P. did not mention digital penetration to police and she denied "[d]igital penetration-stimulation" to the examining nurse, he recites, and she "failed to mention lubrication during her first police interview or during the SANE exam." Appellant's Brief at 24. But Mr. Williams *himself* testified on direct examination that "I put my hands down her pants and started playing with her vagina." Tr. Vol. III at 26. And he notes that "*both* testified that A.P. requested lubricant." Appellant's Brief at 23 (emphasis added). And other claimed inconsistencies are not much more powerful (how certain she was that he could tell how uncomfortable she was giving the back massage, *compare* Tr. Vol. II. at 67 ["Like he could tell I was not into it * * * * I was not giving it my best effort"] *with id.* at 119 [told police "I didn't know if he could tell if I was uncomfortable"]), or are not necessarily inconsistencies at all, *see, e.g.*, Appellant's Brief at 25 (A.P. "only provided [investigators with] logs of her Facebook Messages, not texts from her phone" such as the text asking Michelle to call her that she mentioned for the first time at trial).

{¶ 48} Nor does testimony from the other witnesses cause us to conclude that the jury so lost its way as to create a manifest miscarriage of justice. As Mr. Williams notes, Appellant's Brief at 25, the examining nurse did testify that she was not offering a conclusion as to whether there had been a sexual assault, Tr. Vol. II at 254. But that is not saying, as Mr. Williams would have it, that "[t]he medical testimony provided no

corroboration of A.P.'s allegation," *compare* Appellant's Brief at 25. Beyond her testimony about vaginal injury and a genital exam "consistent with the history given" by A.P., *see* Tr. Vol. II at 241, 223, the nurse testified to observing redness on "the front and side of [A.P.'s] neck, redness and bruising "to the upper extremities," redness to "the area under the chin," a small abrasion "underneath the ear," abrasions to the wrist and on the left knee, bruising to "the left inner arm," and the like, *id.* at 222, 232-35. And somewhat contrary to Mr. Williams's understanding of her testimony to be that "many of the photos taken of A.P. showed no injuries at all," Appellant's Brief at 25 citing Tr. Vol. II at 255, what the nurse said there was that her charting included areas of injury and "several areas" where no injury was observed, Tr. Vol. II at 255. While noting that hospital lighting may not be conducive to photographs showing the full extent of injuries, *id.*, she did describe a litany of injuries in the pictures, *id.* at 232-35, and the jury had those photographs as exhibits.

{¶ 49} Like the examining nurse, tenant Crook did not see what happened in Mr. Williams's basement. He did not hear any commotion over the sounds of the television he was watching upstairs, and he also testified that A.P. smiled and said it was nice to have met him as she departed the residence (after about 20 minutes in the basement and roughly five minutes before Mr. Williams emerged, asking where she was). *Id.* at 168-70. But accepting Mr. Crook's testimony as wholly accurate does not compel one to credit Mr. Williams's version of events over A.P.'s. Mr. Crook's recollection, moreover, did not square fully with Mr. Williams's testimony: Mr. Williams denied, for example, that he had said he "smashed it" in the basement, *compare Id.* at 170 (Crook: " 'smashed it' was the terminology") *with* Tr. Vol. III at 58 (Williams: "that's not what I said to him at that time"). And while Mr. Williams told Mr. Crook that "[b]asically, like she attacked him once they got in the basement, like she jumped on him," Tr. Vol. II at 170 (Crook), Mr. Williams told police that after the massage, "when I roll over to seduce, she did say, No, but she said, Let's get one more drink first," Tr. Vol. III at 69. And Mr. Williams cites no authority for his contention that we are constrained to find that "a true violent rapist would not have engaged" in the post-sex "guy talk" that Mr. Crook related, Appellant's Brief at 28. It does not seem outside the bounds of possibility to

surmise reasons that a rapist might want to depict his victim as the aggressor; in any event, the "guy talk" does not exonerate Mr. Williams.

{¶ 50} Having told police that his encounter with A.P. was "a one-night stand * * * * nothing more," Tr. Vol. III at 72, facilitated by a massage bet he had used before, *id.* at 43, Mr. Williams told the jury that after A.P.'s abrupt departure, "I felt like I was used," *id.* at 30. Considering all the admissible evidence together, even without regard to the trial portions Mr. Williams seeks to excise, we cannot say that the jury evidently lost its way by crediting A.P. over Mr. Williams. (We realize that Mr. Williams came of age well after the *Leave it to Beaver* era, and our analysis attaches no significance to his testimony that, "[l]ike my dad always said, I have a Eddie Haskell personality," *id.* at 39.) We overrule Mr. Williams's third assignment of error.

{¶ 51} Mr. Williams's first assignment of error alleges prosecutorial misconduct. With one prominent exception, the defense did not object to the instances it now characterizes as misconduct, and we assess those matters first.

{¶ 52} Alleged prosecutorial misconduct of the sort claimed here that could have been but was not objected to at trial is reviewed under the standard of plain error. *See, e.g., State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, ¶ 230 (where "trial counsel failed to object" to alleged prosecutorial misconduct, defendant "waived all but plain error"); *State v. Smith*, 97 Ohio St.3d 367, 2002-Ohio-6659, ¶ 45 ("the defense did not object to [certain] purported acts of prosecutorial misconduct and thus waived all but plain error" there, citing *State v. Slagle*, 65 Ohio St.3d 597, 604 (1992)).

{¶ 53} "A reviewing court recognizes plain error with the utmost caution, under exceptional circumstances, and only to prevent miscarriage of justice. [Citations omitted.] 'For an error to be a "plain error" under Crim.R. 52(B), it must satisfy three prongs: (1) there must be an error, meaning a deviation from a legal rule, (2) the error must be "plain,'" meaning an "obvious" defect in the trial proceedings, and (3) the error must have affected "substantial rights," meaning the error must have affected the outcome of the trial.' " *State v. Collins*, 10th Dist. No. 20AP-119, 2021-Ohio-1663, ¶ 11, quoting *State v. J.L.H.*, 10th Dist. No. 19AP-369, 2019-Ohio-4999, ¶ 11, citing *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). We have noted that in the relatively recent formulation of the Supreme Court of Ohio assessing the "substantial rights" prong, a criminal defendant

claiming plain error must show a "reasonable probability" that an identified obvious error resulted in prejudice, that is, that " 'the probability of a different result is "sufficient to undermine confidence in the outcome" of the proceeding.' " *State v. Battle*, 10th Dist. No. 18AP-728, 2019-Ohio-2931, ¶ 22-23, quoting *State v. Tench*, 156 Ohio St.3d 85, 2018-Ohio-5205, ¶ 218 (internal citation omitted).

{¶ 54} The matters that Mr. Williams now claims as prosecutorial misconduct but to which he did not object at trial do not qualify as obvious error (including various unraised evidentiary issues now garbed as misconduct allegations), or do not present a reasonable probability of a different outcome, or both.

{¶ 55} Mr. Williams, for example, now protests that the state elicited and referred to information that A.P. "was a mother and a breast cancer survivor" and activist. Appellant's Brief at 11. But that sort of background information is not wholly and intrinsically out of bounds. *Compare Smith*, 2002-Ohio-6659, at ¶ 46 ("since the testimony merely elicited background information and was 'not overly emotional or directed to the penalty to be imposed' [in the capital case], the remarks do not constitute plain error") (citations omitted). A.P.'s status as a mother was reflected in the electronic messages to which both sides cited, explained certain relevant scheduling decisions she made, and was further raised in relevant conversation with Mr. Williams and in testimony about her brief *My Little Pony* conversation with Mr. Crook's daughter (who was about her own daughter's age). *See, e.g.,* Tr. Vol. II at 47, 50, 60. She also testified that her desire to see her daughter and her successful battle against cancer informed her response to Mr. Williams's conduct. *Id.* at 69 ("all I could think about was my daughter and staying alive so I could get home to her alive"); 70 ("If I just let him do what he wanted, then he would let me go. And I kept thinking, like: You didn't beat cancer just to die here in this rape cave"). Testimony as to the nature of A.P.'s discussions with Mr. Williams on the day at issue, including their discussion of her cancer survivor status, *id.* at 56 ("We talked about my journey through cancer and just life"), were also relevant. We do not find that A.P.'s maternal or cancer survivor status (or similar background about A.P.'s devotion to her job as a make-up artist concentrating on weddings, which responsibilities she said figured into why she didn't report the conduct the following day, *see, e.g., id.* at 75-76, 79) was abused here. The trial court's instructions, moreover, cautioned the jury:

"[d]o not allow any consideration of sympathy for or prejudice against anyone to influence your deliberations." Tr. Vol. III at 147. We see no obvious error regarding the use of this testimony, but in any event we find no reasonable probability (so as to undermine confidence in the verdict) that the jury would have reached a different result had objections been made and sustained.

{¶ 56} In this regard, we note that the portion of the state's closing argument block quoted at page 12 of Appellant's Brief (starting: "It's because she has a daughter[,]" and continuing through references to A.P.'s work and cancer-fighting activities) were offered not as a bald "request for guilty verdicts," *compare* Appellant's Brief at 12, but as part of an argument regarding A.P.'s motivations for reporting the conduct and undergoing the necessarily invasive medical examinations: A.P. "has no motive to lie" and "gets nothing out of this," the prosecutor urged, so "[w]hy go through all of this * * * ? It's because she has a daughter [etc.]." Tr. Vol. III at 135-36. We do not find obvious error in the lack of a trial court interruption there, and we do not find any reasonable probability that the argument affected the result.

{¶ 57} Mr. Williams also takes issue with certain observations made by the police patrolman, A.P.'s friend Michelle, and the examining nurse. Appellant's Brief at 11. Yet Mr. Williams identifies no prosecutorial misconduct in the questions that elicited those responses. The patrol officer, for example, was asked to describe A.P.'s "demeanor" when he interviewed her at the hospital. Tr. Vol. II at 26. We see no obvious error in not cutting off a response. Nor was there obvious error in not striking the response then given: "she was polite. She was upset. That's pretty much it. She was forthright." *Id.* at 26-27. Mr. Williams attempts to make something of the word "forthright," but in this context, allowing that word to stand as descriptive of unhesitating and concise demeanor, *compare* dictionary.com (defining "forthright" to mean "going straight to the point; frank; direct; outspoken"), does not amount to obvious error. Nor do we find obvious error in the trial court not intervening to cut off the prosecutor's question to Michelle about A.P.'s "general personality," Tr. Vol. II at 187, or to strike that response, *id.* at 187-88. Further, neither these responses nor the patrolman's had any reasonable probability of affecting the result of the trial. And Mr. Williams does not explain or offer a citation under his first

assignment of error for his complaint that nurse Stevens "corroborated A.P.'s character." *See* Appellant's Brief at 11.

{¶ 58} Mr. Williams also takes issue with the prosecutor's inquiry into and discussions of the nature of his business. Appellant's Brief at 12-13. But Mr. Williams testified on direct examination that he had a business purpose for meeting A.P. at the bar, *see* Tr. Vol. III at 19 ("So I was really just kind of like more of a business relationship with her. So when we kind of like established that we were going to meet up, I asked Kevin to come with me for that reason"; his plan was to "talk a little bit about business. And I was actually trying to hook Kevin and her up"). The nature of Mr. Williams's business and his interest in A.P. was appropriate ground for cross-examination. And our review of his responses leaves us still uncertain about what, precisely, his business entailed. *See, e.g., id.* at 13 ("I own an energy company called Yocum Telecom. Credit card processing."); 33 ("It's kind of hard to sum up. Basically, I'm a re-seller of like all the major like cell phone companies, TV companies. We also partner with AEP in Cincinnati * * * Basically, I resell their services at a discounted price"); 34 (on typical work day, "I do a lot of meetings. I have like Starbucks, Panera's. I meet with a lot of other people. I also train and teach people how they can start up their home-based business on the side," teaching them "[h]ow to acquire customers, how to show the customers the savings"). And according to the trial transcript, it was Mr. Williams who introduced the word "pyramid" into this discussion: asked whether "these customers * * * kind of report underneath you?", he answered, "Is it pyramid? Is that what you're trying to get at?" *Id.* at 35. We find no plain error involving the questions into or comment on Mr. Williams's business operations.

{¶ 59} We also find no plain error in the prosecutor's closing argument that Mr. Williams was "control[ling]," (and we specifically reject any suggestion that there is a reasonable probability that the outcome of this case was affected by prosecution comments that he referred to his "roommates" as his "tenants" and "has the house professionally cleaned[,]" Appellant's Brief at 13-14, citing Tr. Vol. III at 134; brief's emphasis omitted). The state's argument that "[a] rapist would * * * think he can manipulate the system and think he could control it, think that they could talk their way out. And that's what Mr. Williams was doing," *id.*, may have been made in response to defense counsel's argument that Mr. Williams cooperated with the police because "[h]e

had nothing to hide * * * * [and] everything to offer * * * * He's not a rapist. He told the truth," *id.* at 118. And the trial court instructed the jury that "[e]vidence does not include any statement of counsel made during this trial," and that "[t]he opening statements and the closing arguments * * * * are not evidence." *Id.* at 140. Again, we conclude that there is no reasonable probability that the jury would have reached a different result absent the prosecutorial comment.

{¶ 60} Mr. Williams invokes a variety of other statements from the prosecutors' closing arguments. Appellant's Brief at 14-16. Especially in context, many of these remarks do not involve obvious error on the part of the trial court. *See, e.g.,* Tr. Vol. III at 81-82 (urging jury not to have doubt about whether "this was forced intercourse"); *id.* at 87, 135 ("No one would put themselves through this just for the sake of being dishonest"; A.P. "has no motive to lie"); 123-24 (A.P. motives and prosecution theory of case). The statement that Mr. Williams "even admits she said no in his testimony" was argument not unconnected to the evidence. *Compare id.* at 86 (closing, adding "or at least something like no") *with id.* at 56 (Mr. Williams: "I don't know if it was, No, let's drink some more, or it was, Hold on, let's drink some more"), 69 (to police: "she did say, No, but she said, Let's get one more drink first" before she said "Okay, that's fine" to sex suggestion). And the argument that "it's more common that [sexual assault victims] don't report it right away" is what nurse Stevens said. *Compare* Tr. Vol. III at 130 (closing) with Tr. Vol. II at 248 (Stevens on cross: "It's usually that they are on that two-to-three-day mark"). Argument that Mr. Crook and Mr. Williams laughed that Mr. Williams "smashed it with the victim" was not "[i]mpeachment" of Mr. Crook. *Compare* Appellant's Brief at 16. In any event, no prosecution question or statement specified in this appeal and to which the defense did not object at trial rises to the level of creating plain error because the trial court did not intervene of its own accord.

{¶ 61} Mr. Williams does in his first assignment of error identify one prosecution statement as to which the defense objected and the trial court incorrectly overruled the objection. The prosecutor was out of bounds when, in the first segment of the state's closing argument, he proclaimed: "I have no doubt from the evidence presented over the last two days that [A.P.] did fight." Tr. Vol. III at 83. "An attorney may not express a personal belief or opinion as to the credibility of a witness." *Davis*, 2008-Ohio-2, at

¶ 232, citing *State v. Williams*, 79 Ohio St.3d 1, 12 (1997).  In overruling the objection, the trial court did say, "[t]his is argument[,]" Tr. Vol. III at 83, but the objection should have been sustained.

{¶ 62}  We  review  this  issue  under  the  general  standard  for  prosecutorial misconduct.  Because  the  conduct  in  this  instance  was  improper,  we  must  determine "whether it prejudicially affected [the defendant's] substantial rights."  *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, ¶ 121, citing *State v. Smith*, 14 Ohio St.3d 13, 14 (1984).  "The  touchstone  of  this  analysis  'is  the  fairness  of  the  trial,  not  the  culpability  of  the prosecutor.' "  *Id.* (citation omitted).  "We will not deem a trial unfair if, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments."  *Id.*, citing *State v. Tresh*, 90 Ohio St.3d 460, 464 (2001); *Smith*.

{¶ 63}  Here, as in *LaMar*, "the misconduct * * * did not pervade the trial to such a degree that there was a denial of due process."  *Id.* at ¶ 149.  Here, as there, "[t]he fact that the  prosecutor  engaged  in  some  improper  argument  * * *  does  not  warrant  reversal" where the remarks did not prejudicially affect the defendant's substantial rights.  *Id.* at ¶ 168 (citation omitted).  In considering the effect of the remark in the context of the entire trial, "[w]e must also view the prosecutor's closing argument in its entirety when determining prejudice." *Id.*

{¶ 64}  Our  review  of  the  trial  transcript,  including  our  scrutiny  of  closing arguments, leads us to conclude that it is clear beyond a reasonable doubt that the jury would  have  found  Mr.  Williams  guilty  without  the  comment  to  which  the  defense objected.  (And it does not at all excuse the misconduct to note that it may have presaged certain vigorous arguments by defense counsel.  "I'm here to tell you the truth," defense counsel said, Tr. Vol. III at 94, before later arguing that A.P. "lied to you some more," *id.* at 105, and [perhaps ambiguously] that Mr. Williams "couldn't have been more honest," *id.* at 116.)   In  the  context  of  the  whole  trial  that  juxtaposed  A.P.'s  account  with Mr. Williams's own testimony, the jury was well positioned to reach its verdict.  And the prosecutor's ill-advised remark did not characterize the state's closing generally.  The trial court did identify that specific remark as "argument," and later instructed the jury at least twice that argument is not evidence.  Considering the remark in the context of the state's

closing argument as a whole and in light of the entire trial record, we echo *LaMar* in determining that "we see no basis for reversing [the] conviction based on the prosecutor's comments." *Compare LaMar*, 2002-Ohio-2128, at ¶ 168.

{¶ 65} We overrule Mr. Williams's first assignment of error.

{¶ 66} Mr. Williams urges in his fourth assignment of error that the jury's verdict should be set aside because the trial court improperly admitted hearsay evidence. Mr. Williams emphasizes here Michelle's account of a text message received by her now-husband while they were at Classics bar on the evening in question. "[T]he next text that he got to both of us, though, [from A.P.] was that she had just been sexually assaulted," Michelle testified. Tr. Vol. II at 190. The record reflects no objection at that point. *Id.* Three questions later, after the state inquired, "was there more communication that evening between either you and her or your husband and her?", Michelle began to respond: "There was. He said --," and the defense cut her off with an objection. *Id.* at 191. The trial court sustained the objection and instructed the witness: "You have to stick to what you observed personally. If you got a text, that's fine, but if you weren't on the text, you can't tell us what the text said, and you can't tell us what your husband told you at the bar about what he was getting." *Id.* Michelle responded that she had herself then texted A.P., but when Michelle continued, "[a]nd all she told me was --," the prosecutor cut her off by saying: "You can't speak about what she had said." *Id.* at 191-92 (with Michelle adding, "I asked her if she needed anything, if she was okay, and what was going on," before saying that she spoke with A.P. the next day).

{¶ 67} Mr. Williams summarizes this part of the testimony by reciting that after Michelle's husband told her that A.P. had texted that she had been sexually assaulted, Michelle's "testimony about her husband's communication continued, and Appellant's counsel objected. The objection was sustained, prohibiting any more hearsay. * * * But the damage was done. The jury already heard the contents of A.P.'s alleged text, and nothing was stricken from the record." Appellant's Brief at 31, citing Tr. Vol. II, at 191. Because there was no objection to the part of the testimony that Mr. Williams now identifies as objectionable, and no request that anything there be struck, we review this matter under the standard for plain error. *See, e.g., State v. Bartolomeo,* 10th Dist. No.

08AP-069, 2009-Ohio-3086, ¶ 15 ("defense counsel did not object to any of the above testimony at trial, thereby waiving all but plain error").

{¶ 68} And when objection was made (as to "more communication" beyond that already testified to), the trial court's explanation to the witness in sustaining the objection was appropriate and Mr. Williams does not argue otherwise. Michelle's testimony as to what her husband told her about the text he saw was hearsay (if taken for the truth of what the husband conveyed, albeit perhaps not if used as a predicate to explain Michelle's own conduct, although other limitations might well have been appropriate if an objection and narrowing track had been taken). But in context, the court did not commit an obvious error by allowing testimony to proceed as it did, and we cannot say that there is a reasonable probability of a different jury result on this basis so as to undermine confidence in the result of the trial. *Compare Tench*, 2018-Ohio-5205, at ¶ 218. When objection was made, the trial court did instruct the witness that she was limited to her own personal observations, and Michelle later did testify that she subsequently spoke with A.P. without an intermediary, *see* Tr. Vol. III at 191-92. More significantly, the defense had full opportunity to cross-examine A.P., and the case turned on her account and Mr. Williams's. There was no plain error here, either as to the witness's statement or involving Mr. Williams's right to question Michelle's husband about what the text had said.

{¶ 69} Mr. Williams argues also that the trial court erred by not intervening (without objection) when A.P. testified that upon going down into his basement, she was uncomfortable and texted Michelle: "I wanted her to call me so I could get out of the situation without being rude." *Compare* Appellant's Brief at 33-34 *with* Tr. Vol. II at 66. Failing to jump in to stop (as "hearsay," *see* Appellant's Brief at 33-34) the witness's reference to the fact of and motivation for having sent a text was not obvious error. Moreover, defense counsel cross-examined A.P. at length on this point and as to why she had not mentioned that text earlier. Tr. Vol. II at 85-88, 147-48. There was no plain error here.

{¶ 70} Additionally under this assignment, Mr. Williams argues that Michelle's testimony that A.P. had sounded "shocked" when she spoke with her on the telephone the day following the incident, and was "crying a lot" and "pretty distraught" when they

subsequently met for lunch, constituted testimony regarding " 'verbal acts' [by A.P.] offered for the truth." Appellant's Brief at 34-35, citing Tr. Vol. II at 5-8, 192-93. He submits the same hearsay argument with regard to the patrol officer's testimony that A.P.'s demeanor was "polite," "upset," and "forthright" when the officer interviewed her at the hospital. *Id.* at 35, citing Tr. Vol. II at 5-8, 25-28. The defense made no objection to Michelle's testimony about the telephone call or to the officer's characterization, Tr. Vol. II at 192, 27-28, and the trial court did not commit plain error in allowing either.

{¶ 71} Defense counsel did object to Michelle's testimony about A.P.'s demeanor at lunch, and the trial court overruled that objection. *Id.* at 193. Under the circumstances of this case, we find no abuse of discretion with material prejudice there. Unlike the evidence from the examining nurse, and the testimony of A.P. herself, Michelle's demeanor testimony did not provide A.P.'s account of what had happened. *Id. Compare, e.g., State v. Myers*, 10th Dist. No. 98AP-1448, 1999 Ohio App. Lexis 4619, *23 (Sept. 30, 1999) (no prejudice by limited hearsay merely cumulative of matters properly before jury); *State v. Lewis*, 10th Dist. No. 93AP-911, 1994 Ohio App. Lexis 1879, *12-15, 23-24 (Apr. 28, 1994) (miscited by Appellant's Brief) (two separate witnesses relate significant hearsay details of testifying accuser's account); *State v. Presley*, 10th Dist. No. 02AP-1354, 2003-Ohio-6069, ¶ 33-34 (finding error where improper hearsay testimony "was permitted to essentially repeat" the details of alleged victim's story). Even had the observation that A.P. was distraught been hearsay, *compare, e.g., State v. Fawcett*, 3d Dist. No. 13-99-14, 2001 Ohio App. Lexis 6104 (Mar. 14, 2001), *7 (traumatized conduct there deemed "not assertive, therefore [noting] it was not hearsay"), any error in permitting Michelle's testimony that A.P. cried at their lunch would have been harmless beyond a reasonable doubt in the context of this trial.

{¶ 72} We overrule Mr. Williams's fourth assignment of error.

{¶ 73} The fifth assignment posits "plain error" in the trial court's not intervening to prevent the examining nurse from testifying as an expert beyond the bounds of her examination records. Appellant's Brief at 38-45. Those records catalogued A.P.'s hospital account of the event in question and the findings of nurse Stevens's physical examination. Ex. D. As Mr. Williams states, the nurse: "provided comprehensive testimony about statements made by A.P., the results of her physical examination, and what is shown (and

not shown) in various photographs taken during the examination. This testimony generally outlined her observations as a fact witness." Appellant's Brief at 38.

{¶ 74} Mr. Williams does not assign that testimony as error. Rather, he takes issue with what he deems "opinion testimony" outside the scope of her report. *Id.* at 39-40 (citing testimony that: vaginal injuries are "not very common" in sexual assault victims, in part because a body sometimes can "push fluids" to the area; that the vaginal injuries observed here with the Toluidine blue solution could be described as "genital trauma" and were consistent with A.P.'s account; that a sexual assault victim's immediate response may be to fight, flee, or freeze [meaning "there's possibly no resistance," Tr. Vol. II at 242]; that sexual assault victims do not act uniformly when giving their accounts; and that in her experience, it would not be uncommon for a sexual assault victim to come to her on March 18 for an event that happened on March 16).

{¶ 75} Although the nurse's records as disclosed did in fact reflect "Toluidine blue uptake noted," and repeated with regard to a picture from the vaginal stain examination that "Tb dye up[t]ake noted," *compare* Exhibit D at 4-5 including notes for picture 10 *with* Appellant's Brief at 39, some of the nurse's testimony (including particularly her more generalized statements explaining fight, flight, or freeze responses and her experience with other patients' reporting lags), did go beyond the contours of her records as apparently timely shared with the defense. Criminal Rule 16(K) as modified in 2010 requires that an expert witness "shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion," and that the report shall be made available to the opposing party at least 21 days before trial: "Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial." Crim.R. 16(K). Consistent with case law, Mr. Williams's opening brief to us treats the nurse's "SANE exam records" as "her 'report'[.]" Appellant's Brief at 44, *but see* Reply at 14 (arguing incorrectly that there was "no report" and hence "no opportunity for the defense to consult his own expert").

{¶ 76} Mr. Williams is incorrect in suggesting that our review of potentially offending expert testimony here should employ "harmless error analysis" (even while his brief nods to the "plain error" standard in the actual assignment of error). *Compare* Appellant's Brief at 38 (statement of assignment) *with id.* at 41-42 (regarding harmless

error).  Nurse Stevens offered the testimony identified here without recorded objection. *See* Tr. Vol. II at 240-44; *compare id.* at 208 (no objection to qualification as an expert). Even should a trial court be charged with responsibility for assessing and policing the contours of expert reports despite lack of objection, the standard of review would be for plain error.  *See, e.g., State v. Carpenter*, 7th Dist. No. 19 MO 0010, 2020-Ohio-5295, ¶ 26 ("counsel did not object to [the expert's] testimony or the lack of an expert report. Thus, this matter will be reviewed for plain error"); *compare* State's Brief at 43 ("he must establish plain error").  The case of *State v. Walls*, 6th Dist. No. E-16-027, 2018-Ohio-329, as relied on at pages 43-44 of Appellant's Brief, involved appellate review after the defense at trial "objected and asked that [an 'expert's'] testimony be limited to what was disclosed in the report."  *Id.* at ¶ 17.  And in that case (relating to allegations of child sex abuse and the "expert's" attempts to move from earlier report conclusions significantly more favorable to the defense to trial testimony of " 'serious psychological issues' that 'would fit with being sexually abused,' " *compare id.* at ¶ 10 *with id.* at ¶ 19), the Sixth District Court of Appeals opined in passing that "a party may waive a violation of Crim.R. 16(K)," *id.* at ¶ 34 (citing cases of belated objections).  *State v. McGhee*, 11th Dist. No. 2014-T-0106, 2017-Ohio-5773 (involving "expert" testimony on four-year delayed disclosure that was "vital to the state's case," *id.* at ¶ 20), similarly involved a defense motion to exclude expert testimony under the rule, and the appellate court examined the issue under an abuse of discretion standard.  *Id.* at ¶ 13, 15-16.

{¶ 77}  Under the plain error standard, and reviewing all of the nurse's testimony as now argued by Mr. Williams to have exceeded the bounds of her records, and considering the use of that specific testimony in the context of the trial as a whole, we do not find that there is a reasonable probability of a different jury result had that particular testimony been excluded.  Such exclusion would *not* reach the recorded results of the physical examination conducted by nurse Stevens, including her observations of various bruises, abrasions, and colorations.  As Mr. Williams concedes, the jury " 'could have chosen to ignore [the nurse testimony at issue] and still convict' " Appellant's Reply Brief at 11-12, and we do not conclude that there is a reasonable probability that if the jury had ignored that testimony, it would have seen the same degree of "inherent credibility problems" with A.P.'s testimony that Mr. Williams urges, *compare id.* at 11.  Especially given the

testimony of both A.P. and Mr. Williams, we cannot discern any reasonable probability that the jury would have reached a different result had nurse Stevens's testimony been restricted strictly to her recorded examination findings. We overrule the fifth assignment of error.

{¶ 78} Mr. Williams's sixth assignment of error relates back to what he characterizes as improper "vouching" testimony. Appellant's Brief at 45-47. Here again, he refers to the patrol officer's use of the word "forthright," and to the nurse's "expert" testimony on "various issues relative to A.P.'s demeanor, delayed reporting, injuries, etc." *Id.* at 46-47. We already have discussed that testimony in the context of other assignments of error; suffice it to note here that we find no plain error under this assignment either. Nor do we find plain error in Michelle's characterization of her friend as "calm and collective [sic]" and a "caring person," or of her account as having been "to the point." *See id.* at 46. We overrule the sixth assignment of error.

{¶ 79} Mr. Williams's seventh assignment of error claims ineffective assistance of counsel. Appellant's Brief at 48-49. Counsel was deficient, he contends, "[b]y failing to object to the inadmissible evidence." *Id.* at 48 (relying on his briefing of other assignments in saying that "[t]he record is replete with improper hearsay, inadmissible 'vouching' testimony, and improper expert testimony"). He adds that "[t]here is no indication [in the record] of any pre-trial efforts to obtain" what he calls "relevant text communication" (perhaps meaning the text that A.P. testified she sent from the basement asking that Michelle call her). Appellant's Brief at 49 (not indicating what sort of "indication" should have appeared, or how the defense would have been aided by having the text the absence of which trial counsel was able to suggest, at length in closing, showed a conflict in A.P.'s account, *see* Tr. Vol. III at 102-03).

{¶ 80} Last, Mr. Williams cites to allegations against counsel made in his motion for a new trial, *see* Appellant's Brief at 49 (citing materials from October 3, 2019 motion), but he does not offer any response here to the trial court's reasonably detailed analysis of those claims, *see* November 12, 2010 Journal Entry Denying Motion for New Trial at 2-6 (concluding: "The court finds no support for a claim that defense counsel was ill-prepared before, or deficient during, this trial. Defendant received sensible representation"). And of course he does not assign the trial court's denial of that motion as error here.

{¶ 81} Mr. Williams has the burden of showing both that his trial counsel fell beneath "an objective standard of reasonable representation," and that, under "the same deferential standard" as for plain error, there is "a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *Tench*, 2018-Ohio-5205, ¶ 264, 218, citing *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of the syllabus. "In evaluating allegations of deficient conduct by counsel, 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." ' " *State v. Hill*, 10th Dist. No. 09AP-398, 2010-Ohio-1687, ¶ 9, quoting *Strickland* at 687, further citation omitted.

{¶ 82} Many of the objections that Mr. Williams now proposes in hindsight over the course of his briefing to us would not have had a reasonable opportunity for success, and might have underscored the testimony that he posits here as significant. And even had Michelle's testimony about the message received by her husband the evening of the event (before she spoke with A.P. the next day) been excluded, along with such part of the nurse's expert testimony that arguably went beyond the bounds of her records, we see no reasonable probability that the jury's result would have been different than it was. "Mr. Williams was represented by two retained lawyers," including "a very experienced criminal defense lawyer admitted to the bar in 1985," and they "were on his case from start to finish." Journal Entry Denying Motion for New Trial (a motion cited here by Mr. Williams) at 2. Based on the trial record that is before us, he did not receive ineffective assistance of counsel. We overrule Mr. Williams's seventh assignment of error.

{¶ 83} Mr. Williams appends a catchall eighth assignment contending that "cumulative error" warrants reversal here. Appellant's Brief at 50-54. We disagree.

{¶ 84} "Under the doctrine of accumulated error, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the instances of trial-court error does not individually constitute cause for reversal." *State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, ¶ 230, citation omitted, *overruled in part on other grounds*, *State v. Bates*, 159 Ohio St.3d 156, 2020-Ohio-634. "Errors which are separately harmless can, when considered together, violate an accused's

right to a fair trial." *State v. Norman*, 10th Dist. No. 12AP-505, 2013-Ohio-1908, ¶ 61, citation omitted.

{¶ 85} Mr. Williams did not receive a perfect trial. The prosecutor's statement of personal belief on what the evidence showed was wrong; the nurse's testimony could have been limited somewhat; the objection during Michelle's testimony (with the resulting court instruction to the witness) could have come earlier. But, on our review of the record as a whole, he did receive a fair trial. The jury saw A.P. testify and give her account under vigorous cross-examination. And they saw Mr. Williams testify and provide his version of events (that did not reflect what Mr. Crook said that Mr. Williams had told him about A.P. being the sexual aggressor who "attacked him," but that did include exploration as to the context in which A.P. had said no, and did include his having felt "used" when he learned that A.P. had departed). And while the physical evidence was not "definitive," Appellant's Brief at 52, Mr. Williams does not argue that the nurse's description of redness, bruising, and abrasions should have been excluded. No trial errors, alone or in combination, deprived Mr. Williams of his rights to a fair trial. We overrule the eighth assignment of error.

{¶ 86} Having overruled the eight assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

KLATT and MENTEL, JJ., concur.

NELSON, J., retired, of the Tenth Appellate District, assigned to active duty under the authority of the Ohio Constitution, Article IV, Section 6(C).

_____