[Cite as *State v. McKnight*, 2022-Ohio-591.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                              :

    Plaintiff-Appellee,                         :              No.  20AP-595
(C.P.C. No. 18CR-3566)

v.                                                              :
                                                              (REGULAR CALENDAR)

Demitrious D. McKnight,                         :

    Defendant-Appellant.                      :

---

D E C I S I O N

Rendered on March 1, 2022

---

**On brief**: *G. Gary Tyack*, and *Kimberly M. Bond*, for appellee.

**On brief**: *Wolfe Law Group, LLC*, and *Stephen T. Wolfe*, for appellant.

---

APPEAL from the Franklin County Court of Common Pleas

NELSON, J.

{¶ 1}  The circumstances in this case demonstrate that an aggravated burglary (with trespass in an occupied residence for the purpose of committing a criminal offense and with a gun on one's person) that directly results in death and thereby serves as the predicate offense for a felony murder conviction does not always merge with the murder count at sentencing.  The outcome we reach today is different than it would have been less than a decade ago, for the analysis we apply as directed by the Supreme Court of Ohio has changed. We now examine case- and conduct-specific issues that include whether each of the two offenses caused separate, identifiable harm, rather than asking whether each of the offenses as statutorily defined requires proof of a fact that the other does not.  *Compare State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, ¶ 25 (specifying current test for merger), *with id.*

at ¶ 34-36 (French, J., concurring in judgment only, urging continued use of test from *Blockburger v. United States*, 284 U.S. 299 (1932)).

{¶ 2} A jury convicted defendant-appellant Demitrious D. McKnight of the first-degree felony of aggravated burglary under R.C. 2911.11, with a gun specification, and of felony murder under R.C. 2903.02, also with a gun specification. It acquitted him of aggravated robbery, and counts for aggravated murder and murder charged in another fashion were dropped at the prosecution's request without the jury having reached a verdict. The trial court sentenced Mr. McKnight to 15 years to life in prison for the murder, consecutive to 3 additional years on the gun specification to that count and consecutive, also, to a 4-year prison term for the aggravated burglary and 3 additional years for the gun specification attached to that count. His total sentence therefore was 25 years to life, with 7 of those years attributable to the aggravated burglary count and specification. Oct. 1, 2020 Judgment Entry.

{¶ 3} The verdicts came after the jury heard from witnesses including Ms. A.C. She lived in a first-floor unit at the Berwick Arms apartment complex, and her "grandbaby was staying there," too. Tr. at 191. She told the jury that a "close friend" of hers, a "nice gentleman, respectable," by the name of "New York" (and with the given name, it developed, of Melvin Harris), helped defray her bills in exchange for her permitting him on occasion to deal drugs out of her apartment. *Id.* at 193, 196 ("I would let him sell a little crack, if he paid my bills and stuff, and he did"). That is what he was doing, she said, on the afternoon of May 24, 2018. *Id.* at 193, 198.

{¶ 4} Sales were winding down and Ms. A.C.'s granddaughter had returned to the apartment and gone to her room for a nap when Ms. A.C., who herself had partaken of some crack, heard a knock at the apartment door. *Id.* at 199-200. She "looked out the peak hole," but someone had covered it with his finger, she testified. *Id.* at 201. She demanded that the person move away from the peephole, and did not recognize him, but Mr. Harris instructed her to admit him: "New York said, Ms. [A.C.], open the door so I can sell this stuff and * * * get out of here." *Id.* at 202. Things happened quickly, she recounted. "So when I went to open the door, it was, like, boom; and he was, like, I want it all. I want it all. * * * * I was just so scared because my granddaughter was in the back, and then they point the gun at me, and I'm, like, I ain't got nothing." *Id.* at 202.

{¶ 5} Two men had burst in, she said, and "I didn't even get the door all the way open before they bust through, knocking me in behind the door." *Id.* at 205. "[W]hen they came in, when they pushed the door in, I slammed in against the wall and the door came to me." *Id.* at 207. The "dark-skinned guy," whom she subsequently identified as defendant McKnight, "bust through with a gun." *Id.* at 205, 206-07 (identification of defendant, who "had a nine" [millimeter firearm]). She screamed, and they told her: "We want the money. Shut the fuck up --." *Id.* at 209. Both men approached Mr. Harris, who remained calm, while Ms. A.C.'s thoughts turned to rescuing her granddaughter. *Id.* at 202. "So * * * they went to New York and was, like, MF, give me the money, give me the shit. Give me the shit. Give me the shit. Give me the money. Give me the shit. Just give me it all. Give me it all." *Id.* at 203; *see also id.* at 209.

{¶ 6} Ms. A.C. testified that she then ran out of the apartment, intending to circle around and get her granddaughter out through a window. *Id.* at 203, 210, 212. She turned around and saw the second intruder ("light skinned with dreadlocks" and wearing a red hoodie, *id.* at 204) coming past her out of the apartment; she put up her hands and started screaming again. *Id.* at 212. At this point, she said, she had not heard any gunshots. *Id.* at 212. "[T]hen he just ran past * * *, he was just trying to get away. * * * * So then that's when the shots said, Pop, pop, pop, pop, pop, pop. They just start. I said, Oh, Momma. My granddaughter over in there." *Id.* at 213. But then her granddaughter appeared, running away from the apartment. *Id.* at 214.

{¶ 7} After hugging her granddaughter, Ms. A.C. approached the building and saw Mr. McKnight emerging from her window. *Id.* at 215 ("the defendant was hanging out my window * * * *; and I heard him say, Help. Help."). A building security guard arrived, gun drawn, and Ms. A.C. followed him back toward her apartment to check on the status of Mr. Harris "and all of this stuff." *Id.* at 216. Ms. A.C. further testified that she later picked Mr. McKnight out of a photo array and identified him as having "had a gun and entered the apartment"; she did not see his compatriot in the red hoodie to have a gun, she said, and her recollection of these events was "[n]ot at all" impaired by her having smoked crack that day. *Id.* at 218-19.

{¶ 8} Called to the witness stand, security guard Eric Baker told the jury that he had been flagged down by a woman "saying someone just shot up her apartment." *Id.* at

270.  Upon arriving at the scene, he "noticed a male trying to come out of a window."  *Id.*
That man turned out to be Mr. McKnight, who had been shot in the face.  "[O]nce we got
him out -- fully out of the window and onto the ground, we were informed that there was
someone else still inside."  *Id.* at 271-72.

{¶ 9}   Mr. Baker entered the building and discovered Mr. Harris lying in the entry
to the apartment, with his torso extending into the hallway.  *Id.* at 276.  "He had been shot,"
but was "still alive" and asking for help.  *Id.* at 272.  Mr. Baker "asked him did he know who
shot him, and he kind of just pointed like towards the window, or outside, but he wasn't
able to say who it was or the description or anything of that nature.  He just kept pointing
as [if] to say they were outside."  *Id.* at 273.  Mr. Baker confirmed that the window at which
he thought Mr. Harris was pointing was the same window from which Mr. McKnight had
emerged.  *Id; see also id.* at 277 (from his prone position, Mr. Harris was pointing back
through the apartment "towards the window").

{¶ 10}  A police officer who responded to the scene testified to having observed Mr.
McKnight lying in front of the building with "an apparent gunshot wound to his face."  *Id.*
at 68 (Officer Lucci).  Inside the apartment, the officer found Mr. Harris in "[v]ery bad"
condition with gunshot wounds and "unable to speak."  *Id.* at 74.  The officer searched Mr.
Harris and found "a large sum of money" and "a large [amount of] suspected crack cocaine
in his pants' pockets."  *Id.* at 75.  He also found two guns in the apartment, one a "MAC-9"
[sic], the other a revolver.  *Id.* at 77; *see also* Ex. B (Crime Scene Search Unit report with
two "Recovered Firearm" forms, one for the Cobray MAC-11 9 mm weapon, the other for a
Sturm Ruger .357 revolver), Ex. E (Firearms Report).

{¶ 11}  The Coroner's evidence indicated that Mr. Harris died that day from two
gunshot wounds to the trunk of his body.  *Id.* at 179, 181-82, and Ex. D.  Both bullets passed
through the body without leaving fragments.  *Id.* at 171.  Each bullet had at least a slightly
downward trajectory, one piercing his liver and the other his colon.  *Id.* at 178, 180.

{¶ 12}   The state also adduced evidence that three spent casings from the scene had
come from the 9 mm Cobray semi-automatic pistol and that five spent cartridge casings
were in the .357 Magnum.  *Id.* at 318, 321, and Ex. E.  Other expert testimony revealed that
a bullet recovered at the scene with Mr. Harris's blood on it was capable of having been
fired from the Cobray 9 mm but not from the .357 Magnum.  *See Id.* at 431 (blood DNA

testimony); 320-22 (firearms expert). Mr. Harris was not a major contributor of DNA to either gun; Mr. McKnight in all overwhelming probability was a major contributor of DNA to both, including to DNA (from blood) on the trigger and handle of the Cobray MAC-11. *Id.* at 418, 419, 425-27 (testimony of forensic DNA analysis Miranda Smith). And the DNA analyst testified that Mr. McKnight's DNA was found on fingernail scrapings from Mr. Harris's left hand, as well as on the apartment's doorjamb. *Id.* at 428-29.

{¶ 13} The state also presented the testimony of a jailhouse informant, S.A. He testified to having been housed with Mr. McKnight for "a month or two" (a time period that grew considerably shorter under cross-examination) while Mr. McKnight was awaiting trial in this case. *Id.* at 331, 361-62. According to S.A., Mr. McKnight confessed that he and an unnamed colleague had "forced their way into" an apartment after having gone there under the "guise that they were * * * to sell or purchase a weapon." *Id.* at 333, 335. After having "had to get up in there," the story ran, Mr. McKnight and the "victim * * * got to arguing and, like, talking strongly back and forth to each other. He said that he pulled out his phone, just looking around to see, like, what was inside the apartment, whatever, and a few minutes later he heard a gunshot, and he responded to the gunshot, and next thing you know he was shot, and he said he was stumbling back and fell * * * out the window." *Id.* at 336. S.A.'s account continued that Mr. McKnight "said that the person pretty much got what [h]e deserved, and he said it was funny how he got shot in the face and survived and that person didn't, and he died; and so he had said everything that he got he deserved." *Id.* at 339-40 (with the transcript perhaps not entirely clear as to whether that last "he" connotes Mr. Harris or Mr. McKnight). S.A. also testified that Mr. McKnight had said that he was tipped off to the hold-up prospect by a female neighbor. *Id.* at 340; *see also id.* at 387.

{¶ 14} S.A. acknowledged that he received significant consideration for providing his account. His potential sentence on a pending robbery charge was reduced from 22 to 12 years (not counting a potential year and a half for post-release control violation) when the state agreed on his plea of guilty to dismiss a repeat violent offender specification that had been based on an earlier robbery, and the state further agreed to recommend that he receive a sentence of five years in prison. *Id.* at 344 (reciting cooperation agreement), 357. The case detective acknowledged that various witness reports and other details involving the events in question would have been in the state's discovery provided Mr. McKnight (and

potentially available, the defense suggested, in his jail pod). *Id.* at 472-73 (Detective Mall), 364 (S.A. concedes that reading someone's discovery packet in a prison pod is a theoretical possibility).

{¶ 15} The state also called the detective, Aaron Mall. Detective Mall was permitted to testify, among other things, as to his understanding that Mr. Harris had been under federal investigation for illegal weapons dealing at the time of his death. *Id.* at 469. He testified, too, that Ms. A.C. had described Mr. McKnight as having had a gun in his hand, and that her description of the gun matched the Cobray MAC-11 found inside the apartment, *id.* at 493. He characterized Ms. A.C. as having "seemed lucid" and cogent when he spoke with her on the evening of the shooting. *Id.* at 497.

{¶ 16} Detective Mall interviewed Mr. McKnight on July 16, 2018, some 54 days after the event. *Id.* at 503. The jury heard a tape-recording of that discussion. *Id.* at 511-31 (trial commentary by Detective Mall about the tape; the record contains no transcript of the interview), Ex. J (CD recording). Mr. McKnight told the detective that he had gone to the apartment to try to sell a gun "[i]n exchange for an eight ball of powder [cocaine]." *Id.* at 518 (Detective's summary). "[T]hey got to arguing" over the price of the gun, and "[t]he deceased tried to grab Mr. McKnight's gun," according to Mr. McKnight. *Id.* at 520 (adding "that the deceased went for his gun and that the deceased then shot Mr. McKnight"). Mr. McKnight said that he had procured the MAC from "a crackhead," *id.* at 523, and that he did not know the identity of the person who had accompanied him into the apartment, *id.* at 529.

{¶ 17} Against this backdrop, Mr. McKnight presents us with three assignments of error on appeal: he claims first that the verdicts were not supported by sufficient evidence, next that they were against the manifest weight of the evidence, and third that "[t]he trial court erred when it found that the aggravated burglary and murder charges did not merge for sentencing purposes." Appellant's Brief at i.

{¶ 18} "In reviewing a challenge to the sufficiency of the evidence, an appellate court must determine 'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Neil*, 10th Dist. No. 14AP-981, 2016-Ohio-4762, ¶ 94, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

"Where the evidence [of guilt], 'if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt,' it is sufficient to sustain a conviction." *Id.; see also, e.g., State v. Williams*, 10th Dist. No. 19AP-824, 2021-Ohio-3006, ¶ 38.

{¶ 19} In assessing Mr. McKnight's first assignment of error, we therefore examine the record to see whether the state adduced sufficient evidence to support his convictions for aggravated burglary and felony murder, both with gun specifications.  It did.

{¶ 20} As relevant here, Ohio's aggravated burglary statute specifies that: "No person, by force, stealth, or deception, shall trespass in an occupied structure * * * when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense, if any of the following apply: (1) The offender inflicts, or attempts or threatens to inflict physical harm on another; [or] (2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control."  R.C. 2911.11(A).  The trial court charged the jury consistent with that statute, and more specifically advised that before they could find Mr. McKnight guilty, jurors had to find beyond a reasonable doubt that he had "trespassed by force or stealth" with purpose to commit a criminal offense and either "recklessly inflicted * * * or attempted to inflict * * * physical harm upon * * * Martin Harris and/or [Ms. A.C.], and/or [Mr. McKnight] had * * * a firearm on or about his person or under his control."  Tr. at 709 (further defining certain terms).  With regard to the gun specification attached to that count, the trial court instructed the jury that if it concluded that Mr. McKnight was guilty of aggravated burglary, it further had to "decide whether the state has proved beyond a reasonable doubt that [Mr. McKnight] had a firearm on or about his person or under his control while committing the Aggravated Burglary and did display the firearm, brandished the firearm, indicated that he possessed the firearm, or used it to facilitate the Aggravated Burglary."  *Id.* at 712-13.

{¶ 21} Mr. McKnight's brief to us does not contest the sufficiency of the evidence that supported both the "deadly weapon or dangerous ordnance" element of the second, alternative prong of the aggravated burglary statute and the attached gun specification. Indeed, his brief contends that proof showed "Harris tried to grab McKnight's gun, a MAC-11 Cobray."  Appellant's Brief at 3.  Nor does Mr. McKnight contest that the state offered sufficient proof that the apartment was occupied at the time of the event, and that he was

there to commit a criminal offense.  Rather, he contends that he "was an invited guest and thus, by definition, was not trespassing" in Ms. A.C.'s apartment.  *Id.* at 8 (adding, "they knocked and were let into the apartment").

{¶ 22} But one can trespass in a home even if one knocks and the door is opened (after one removes one's finger from the peephole).  As the trial court advised the jury, "[a] person trespasses when, without privilege to do so, that person knowingly enters *or remains* on the premises of another." Tr. at 710 (emphasis added); *see also* R.C. 2911.21(A)(1).  "Privilege," as the trial court further instructed, "means an immunity, license, or right conferred by law, or bestowed by express or implied grant, or arising out of status, position, office, or relationship, or growing out of necessity." Tr. at 710; *see also* R.C. 2901.01(A)(12).  Starting to open one's door is not an express or implied grant to those entering to engage thereafter in any conduct without limit.  *See, e.g., State v. Steffen*, 31 Ohio St.3d 111, 115 (1987) ("a privilege once granted may be revoked. * * * * Under the circumstances of this case, even assuming lawful initial entry, the jury was justified in inferring from the evidence that appellant's privilege to remain in [the] home terminated the moment he commenced his assault"); *State v. Cutts*, 5th Dist. No. 2008CA00079, 2009-Ohio-3563, ¶ 181 ("Where a defendant commits an offense against a person in the person's private dwelling, the defendant forfeits any privilege, becomes a trespasser, and can be culpable for aggravated burglary."); *State v. Tyson*, 10th Dist. No. 10AP-830, 2011-Ohio-4981, ¶ 26 ("Even if one or more of the men were initially invited inside the apartment, that invitation was revoked when they began stealing items.").

{¶ 23} Ms. A.C.'s testimony, if believed, would itself provide more than sufficient basis to find that Mr. McKnight trespassed in her residence.  And the *method* of that trespass—by "force," with "stealth" not relevant under the proof adduced and with the jury not having been charged as to "deception"—is not directly contested by Mr. McKnight's brief, which focuses solely on the means of entry: "they knocked and were let into the apartment." *See* Appellant's Brief at 8-9.  Ms. A.C. testified that immediately after she opened the door, "it was, like, boom" and Mr. McKnight "bust through with a gun." Tr. at 202, 205.  "I didn't even get the door all the way open before they bust through, knocking me in behind the door." *Id.* at 205.  She was "slammed in against the wall," and when she screamed, she says, Mr. McKnight and his colleague told her:  "We want the money.  Shut

the fuck up." *Id.* at 207, 209. When Mr. McKnight slammed in through the door with a gun and triggered Ms. A.C.'s screams (on this account), he lost any privilege he had to enter or remain in the dwelling. He cannot seriously be heard to argue that at that point, simply because the door had been answered, he was "an invited guest." *Compare* Appellant's Brief at 8. On these facts, he had forfeited any "guest" status even before he and his colleague approached Mr. Harris and (on Ms. A.C.'s testimony) demanded: "MF, give me the money, give me the shit. Give me the shit. [And so forth.]" *Compare* Tr. at 203, 209.

{¶ 24} We overrule Mr. McKnight's first assignment of error to the extent that it challenges the sufficiency of the state's evidence with respect to his aggravated burglary conviction and the related gun specification.

{¶ 25} The jury also convicted Mr. McKnight of felony murder with a gun specification. R.C. 2903.02(B) provides in relevant part: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree." Aggravated burglary is a felony of the first degree, R.C. 2911.11(B), and it is an offense of violence, R.C. 2901.01(A)(9)(a). Mr. McKnight's only argument that his felony murder conviction with the specification was not supported by sufficient evidence is that "because aggravated burglary is an element of felony murder" in these circumstances, and because there was insufficient evidence to support the aggravated burglary charge (under his "invited guest" postulate), "the state did not make its prima facie case for [the felony murder] count either." Appellant's Brief at 8. But because the state did present sufficient evidence to support its aggravated burglary charge, Mr. McKnight's syllogism falls apart. We overrule his first assignment of error in full.

{¶ 26} Mr. McKnight's second assignment of error posits that the jury's verdicts were against the manifest weight of the evidence. "To evaluate a claim that a jury verdict is against the manifest weight of the evidence, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial." *State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, ¶ 168, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). Reversal on manifest weight grounds is appropriate " 'only in

the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 27} "Though appellate courts must sit as a 'thirteenth juror' when considering a manifest weight argument, [they] must also give great deference to the trier of fact's determination on the credibility of the witnesses." *State v. Kurtz*, 10th Dist. No. 17AP-382, 2018-Ohio-3942, ¶ 31 (citation omitted). So " ' "where a factual issue depends solely upon a determination of which witnesses to believe, that is the credibility of witnesses, a reviewing court will not, except upon extremely extraordinary circumstances, reverse a factual finding either as being against the manifest weight of the evidence or contrary to law." ' " *In re Johnson,* 10th Dist. No. 04AP-1136, 2005-Ohio-4389, ¶ 26, quoting cases including *State v. Fluellen*, 10th Dist. No. 74AP-138, 1974 Ohio App. Lexis 3688 (July 30, 1974) at * 7. " '[W]e are guided by the presumption that the jury * * * "is best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony." ' " *Kurtz* at ¶ 18 (further citations omitted). *See also, e.g., State v. McGowan*, 10th Dist. No. 18AP-467, 2019-Ohio-5319, ¶ 54 (quoting *Wilks*, *Thompkins*, *Kurtz*, and *Johnson*).

{¶ 28} Mr. McKnight limits his manifest weight argument to questioning the credibility of Ms. A.C. and of jailhouse informant S.A. Ms. A.C., he notes, "had been smoking crack," and so, he postulates, her "perception of what was happening around her was clouded. Further [and here, Mr. McKnight credits Ms. A.C.'s account, at least to some extent], she ran out of the apartment almost immediately after willingly letting McKnight enter, so she had no idea what transpired after her exit." Appellant's Brief at 10. But outside parties including two police officers and security guard Baker gleaned important information from Ms. A.C. Interviewing her a few hours after the event, Detective Mall found her "lucid." She presented naturally vivid but quite coherent and largely consistent testimony to the jury, and her drug use was the subject of interrogation at trial and known to the jurors. Physical evidence, including the gun that she described Mr. McKnight as wielding, was consistent with her account (and Mr. McKnight's own brief references "McKnight's gun," Appellant's Brief at 3). Moreover, she did testify to firsthand observations after she left the apartment: it was not until after Mr. McKnight's colleague had fled past her that she heard gunshots, and she thereafter saw Mr. McKnight "hanging

out" of her apartment window (a physical fact confirmed, too, by security guard Baker). The evidence is indisputable, moreover, that there was a shooting in Ms. A.C.'s apartment at the time in question: Mr. McKnight was shot in the face, and Mr. Harris wound up dead. Those extraordinary events were real, not some fantasy of crack-induced "paranoia." *Compare* Appellant's Brief at 10.

{¶ 29} One need not accord any significant weight to the testimony of jailhouse informant S.A. (beyond the fact of his generous "cooperation agreement") in order to conclude that the jury was entirely within its right to reach the verdicts it did. By Ms. A.C.'s account, Mr. McKnight was the only person (other than Ms. A.C.'s granddaughter) in the apartment with Mr. Harris at the time of the shooting. And the evidence is overwhelming that Mr. McKnight came tumbling out of the window almost immediately thereafter. Again, Ms. A.C.'s account of the apartment invasion and Mr. McKnight's possession of the MAC-11 pistol is consistent with the physical evidence, including Mr. McKnight's DNA on the gun trigger and doorjamb, as well as with Mr. McKnight's admission to possession of the gun. The jury also was entitled to consider facts such as Mr. McKnight's DNA having been found on the swab of Mr. Harris's fingernails, and (for whatever it was worth) Mr. Harris's dying gesture pointing in the direction of the window.

{¶ 30} Considering Mr. McKnight's arguments in the context of the full record of this case, we cannot say that the jury clearly lost its way and created a manifest miscarriage of justice. We overrule the second assignment of error.

{¶ 31} We turn, then, to Mr. McKnight's third assignment of error and the question of whether the counts for aggravated burglary and murder merge together or stand as separate convictions. "The General Assembly in codifying double-jeopardy protections [contained in the United States and Ohio Constitutions] has expressed its intent as to when multiple punishments can be imposed." *Ruff*, 2015-Ohio-995, at ¶ 12. R.C. 2941.25 directs:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment

or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

Thus, instructs the Supreme Court, "R.C. 2941.25(B) sets forth three categories in which there can be multiple punishments: (1) offenses that are dissimilar in import, (2) offenses similar in import but committed separately, and (3) offenses similar in import but committed with separate animus." *Ruff* at ¶ 20. That assessment is a judicial determination. *See id.* at ¶ 13.

{¶ 32} The current status of the law in Ohio as elucidated in *Ruff* is that "[r]ather than compare the elements of two offenses to determine whether they are allied offenses of similar import, the analysis must focus on the defendant's conduct to determine whether one or more convictions may result, because an offense may be committed in a variety of ways and the offenses committed may have different import. No bright-line rule can govern every situation." *Id.* at ¶ 30. The Supreme Court has directed that:

> A trial court and the reviewing court on appeal when considering whether there are allied offenses that merge into a single conviction under R.C. 2941.25(A) must first take into account the conduct of the defendant. In other words, how were the offenses committed? *If any of the following is true, the offenses cannot merge* and the defendant may be convicted and sentenced for multiple offenses: (1) the offenses are dissimilar in import or significance—in other words, each offense caused separate, identifiable harm, (2) the offenses were committed separately, or (3) the offenses were committed with separate animus or motivation.

*Id.* at ¶ 25 (emphasis added). *See also id.* at ¶ 22 ("the inquiry should not be limited to whether there is separate animus or whether there is separate conduct. Courts must also consider whether the offenses have similar import") (citation omitted). Also of significance here, the high court added: "We do not hold that every aggravated burglary and rape automatically lead to the same import. As we have explained, even if Ruff committed the aggravated burglary and the corresponding rape of each victim with the same conduct, he could still be convicted of both offenses if the offenses are of dissimilar significance and have separate and identifiable harm." *Id.* at ¶ 28.

{¶ 33} Thus, we know from authority of the Supreme Court that there is now no overarching rule to the effect that where one offense is predicated on the commission of

another, with the second essentially being an element of the first, the two must automatically merge at sentencing. *Ruff* and its rejection of the *Blockburger* test tells us as much. *See id.* at ¶ 28 (remand to court of appeals to consider "the import of the offenses"), *id.* at ¶ 29. And we understand *State v. Earley,* 145 Ohio St.3d 281, 2015-Ohio-4615, to confirm the point. *See id.* at ¶ 15, 17 (motor vehicle operator sentencing provision does not create an exception to general rule regarding allied offenses; nonetheless, where an OVI offense is the predicate for an aggravated vehicular assault conviction, "R.C. 2941.25 permits separate convictions for both" because "causing serious physical harm while driving under the influence * * * * has a different import and significance than merely driving under the influence").

{¶ 34} "[A]n appellate court reviews the trial court's R.C. 2941.25 determination de novo." *State v. Flood*, 10th Dist. No. 18AP-206, 2019-Ohio-2524, ¶ 25 (citations omitted). Following the Supreme Court's decision in *Ruff*, we acknowledged in *Flood* that "[i]n conducting an analysis of whether two offenses are allied offenses of similar import, the Supreme Court of Ohio directs an appellate court to look beyond the statutory elements and to consider the defendant's conduct." *Flood* at ¶ 29. "Ultimately, if the harm resulting from each offense is separate and identifiable, the offenses are of dissimilar import and do not merge." *Id.* at ¶ 28. We found there that "because there was separate conduct to constitute the separate offenses of tampering with evidence and gross abuse of a corpse, the trial court did not err in refusing to merge the two offenses." *Id.* at ¶ 34; *see also id.* at ¶ 33 ("the state clearly demonstrated at trial that the tampering with evidence charge related to the distinct acts that occurred prior to Flood's disposing of [a] body in the water. Stated another way, the offense of tampering with evidence was already complete before Flood engaged in separate conduct to constitute the offense of gross abuse of a corpse").

{¶ 35} The trial court here found that "there is clearly a separation between the aggravated burglary and then [the shooting] which ultimately became a felony murder." Tr. at 783 (sentencing hearing; also emphasizing the "time lapse" between Mr. McKnight's having "entered the house initially with the firearm intending, I think, to threaten," and the later shooting). The trial court then opined, however, that the two offenses "were of similar import, which would be the first prong [of the *Ruff*-type analysis], [while] under the second prong they were committed separately, and under the third there was a separate animus."

*Id.* We find that conclusion precisely backwards, but because we determine that the "first prong" of separate and identifiable harm is established, for much the reason the trial court cited, we will affirm the trial court's judgment that the two counts do not merge. (In fairness, we note that the trial court may have been led astray in its analysis by a concession of defense counsel, who had argued: "I do agree that aggravated burglary does have a separate animus than [sic] a felony murder charge, but the problem is that they fail on prongs two and three of that analysis." *Id.* at 780 [although then adding that "the jury found him guilty of a felony murder charge with the predicate of aggravated burglary, so that is another reason why that consecutive sentences shouldn't be imposed in this case"]. We note again that *Ruff* directed that if any one of the three prongs is met, the counts do not merge. *Ruff* at ¶ 25.)

{¶ 36} An aggravated burglary and felony murder predicated on that aggravated burglary by definition (of those offenses) do not have separate animus. Indeed, where the aggravated burglary is the predicate offense for the murder, the requisite state of mind is found in the aggravated burglary offense, not independently in the felony murder. The felony murder statute under which Mr. McKnight was convicted " 'does not require the state to prove any purpose or specific intent to cause death. The mens rea element for felony murder under R.C. 2903.02(B) is satisfied when the state proves the intent required for the underlying felony.' " *State v. Jennings*, 10th Dist. No. 09AP-70, 2009-Ohio-6840, ¶ 50, quoting *State v. Ford*, 10th Dist. No. 07AP-803, 2008-Ohio-4373, ¶ 27 (further citations omitted). Here, because felony murder is committed when a person causes the death of another "as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree" (absent certain exceptions not relevant here), R.C. 2903.02(B), the aggravated burglary supplied the mens rea for the felony murder. The "animus or motivation" of the two crimes was not separate. By the same token, because the aggravated burglary was the lone predicate for the felony murder, the offenses were definitionally interlocked and not committed separately.

{¶ 37} But we conclude that the offenses were not of similar import or significance: each caused separate, identifiable harm. On this record, the aggravated burglary conviction did not hinge on the fact that Mr. Harris was shot and died. Given the trespass in the occupied structure with people other than Mr. McKnight and his colleague there and with

his purpose to commit a criminal offense, the elements of aggravated burglary were satisfied here when it was established that Mr. McKnight had a gun on or about his person or under his control. *See* R.C. 2911.11(A)(2). Ms. A.C. testified to Mr. McKnight's having had a gun; he admitted to it; the gun was recovered at the scene; and—significantly—the jury found Mr. McKnight guilty of the gun specification under the aggravated burglary count. That finding, by which the jury confirmed beyond a reasonable doubt that Mr. McKnight "had a firearm on or about his person or under his control while committing the Aggravated Burglary and did display the firearm, brandished the firearm, indicated that he possessed the firearm, or used it to facilitate the Aggravated Burglary," Tr. at 713 (jury instructions), comprehends and extends beyond every aspect of the "on or about the offender's person or under the offender's control" language of the underlying aggravated burglary statute that permits conviction even absent infliction or threatened infliction of physical harm.

{¶ 38} Bringing a gun to a burglary is, on this record, distinct from causing a death; the aggravated burglary here would have been an aggravated burglary whether or not Mr. Harris had died. We acknowledge that the issue is complicated somewhat by the trial court's having instructed the jury that it could base an aggravated burglary finding either on threatened, attempted, or actual infliction of physical harm to Mr. Harris and/or Ms. A.C., *or* on Mr. McKnight's having had about him a deadly weapon, without requiring the jury to separate those findings. *See* Tr. at 709 (jury charge). But there was no objection to that part of the instructions; the instructions are not invoked as ground for appeal; and the jury *did* separately conclude that Mr. McKnight had a gun during the aggravated robbery when it found him guilty of the aggravated robbery gun specification. *Compare State v. Macias*, 2d Dist. No. 1562, 2003-Ohio-1565, ¶ 35 ("The jury ultimately found Macias guilty of the firearm specification accompanying count two. Therefore, it is evident that the jurors concluded a deadly weapon was used in the theft of Mrs. Wiley's purse. The unanimous verdict on the firearm specification establishes that the jury * * * necessarily found Macias guilty of aggravated robbery under R.C. § 2911.01(A)(1) for using a deadly weapon * * * in the commission of a theft offense").

{¶ 39} Moreover, since we are enjoined to review the record and assess harms caused by Mr. McKnight's conduct, we observe that the evidence was overwhelming that

Ms. A.C. and her granddaughter both were in the apartment at least at the outset of the aggravated burglary and that Ms. A.C. would have been a victim of the aggravated burglary even had Mr. Harris not been shot. Her testimony is that after being slammed into the wall when Mr. McKnight stormed in (with a gun), and after being told, "We want the money. Shut the fuck up," and as Mr. McKnight and his colleague were turning to Mr. Harris and demanding that he give them the money and drugs, she fled the apartment. Mr. McKnight's own brief confirms that "she ran out of the apartment almost immediately after * * * letting McKnight enter, so she had no idea what transpired after her exit." Appellant's Brief at 10. In this case, the aggravated burglary as committed with a grandmother and granddaughter in the apartment along with Mr. Harris created distinct and identifiable harms in addition to the harm done Mr. Harris.

{¶ 40} Our conclusion that under the circumstances and verdicts of this case, the aggravated burglary and the felony murder were "dissimilar in import or significance," to quote from the *Ruff* test, might be different if the aggravated burglary had been predicated solely on the physical harm done Mr. Harris and without the jury finding that Mr. McKnight had a gun during the aggravated burglary. That would make this case much closer to *Ruff II*, where the court of appeals for the First District determined on remand that aggravated burglary and rape counts did merge where it was "the physical harm element [of the rape] that elevates the [burglary] offense to aggravated burglary." *State v. Ruff*, 1st Dist. No. C-120533, 2015-Ohio-3367, ¶ 3. There, "the conduct constituting the rape was an element of the aggravated burglary," *id.* at ¶ 17, and so the harm caused by the rape was not "separate and identifiable" from the harm that was the sole aggravating basis for the aggravated burglary, *id.* at ¶ 13. To the same effect is *State v. Ramey*, 2d Dist. No. 27636, 2018-Ohio-3072, ¶ 21, where "[w]ithout the physical harm caused by the felonious assault, the burglary would not have had the aggravating element of inflicting physical harm" that allowed it to serve as predicate for the felony murder charge there. Not so here, where possession of the gun as found by the jury in the specification sufficed as an aggravating factor that elevated Count One in Mr. McKnight's case to aggravated burglary, with harms separate from the death of Mr. Harris (the harm resulting from the felony murder).

{¶ 41} The later First District case of *State v. Robinson*, 1st Dist. No. C-170147, 2019-Ohio-387, further illustrates the distinction. There, the court held that the harm from a

felony murder as predicated on felonious assault was not separate from the harm done by the felony murder: it was the same harm, accomplished by the same act, and consequently those two counts were required to merge. *Id.* at ¶ 59. But another count accused the defendant "of aggravated burglary for trespassing in the home to commit a criminal offense while possessing a deadly weapon, in violation of R.C. 2903.11(A)(2). In the trial court, [the defendant there] argued this offense related to the harm inflicted on [the deceased victim] and merged accordingly with the other [sic] offenses predicated on that physical harm. We disagree with this argument," said the court. *Id.* at ¶ 60. "The aggravated burglary charged in [that count] was not predicated on the physical harm inflicted on [the deceased]. Instead, the aggravating factor was based on [defendant's] possession of a deadly weapon while committing the burglary. The harm from bringing a weapon into a home is separate and identifiable from the harm resulting when you use that weapon," and thus that aggravated burglary offense "involved an import separate from the other offenses." *Id.* at ¶ 61.

{¶ 42} The court of appeals for the Second District adopted much the same analysis in the recent case of *State v. Albertson*, 2d Dist. No. 28722, 2021-Ohio-2125. Where aggravated robbery and felony murder offenses hinged on the same harm (the death of the victim), those counts merged. *Id.* at ¶ 105 ("Without the serious physical harm caused by the * * * felony murder, the aggravated robbery would not have had the aggravating element of inflicting serious physical harm."). But the state won its appeal of the trial court's decision to merge aggravated burglary offenses with the felony murder offenses. "Unlike the aggravated robbery, the evidence presented at trial indicates that [the defendant's] commission of the aggravated burglary was not dependent on [the fire that led to the death]." *Id.* at ¶ 107. The "aggravated burglary was completed once [the defendant] physically harmed/hit [the victim] while in the course of trespassing"; it resulted in a harm different from the death caused by the fire. *Id.* at ¶ 109.

{¶ 43} Similarly, Mr. McKnight's conduct in invading Ms. A.C.'s apartment while in possession or control of a gun and with the purpose to commit a felony caused harm separate from the shooting death of Mr. Harris. And it also involved at least one separate victim. *Compare Ruff*, 2015-Ohio-995, at ¶ 23 (noting precedents "that when the

defendant's conduct put more than one individual at risk, that conduct could support multiple convictions because the offenses were of dissimilar import").

{¶ 44} Because the aggravated burglary and the felony murder were offenses of dissimilar import or significance under the controlling *Ruff* analysis, with each offense generating its own separate and identifiable harm, we overrule Mr. McKnight's third assignment of error.

{¶ 45}   Having overruled each of Mr. McKnight's three assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

SADLER and JAMISON, JJ., concur.

NELSON, J., retired, of the Tenth Appellate District, assigned to active duty under the authority of the Ohio Constitution, Article IV, Section 6(C).

_____